| | | |
|---|---|---|
| UNITED STATES DISTRICT COURT | ) | |
| FOR THE EASTERN DISTRICT OF MISSOURI | ) | |
| | ) | |
| UNITED STATES OF AMERICA | ) | |
| and STATE OF MISSOURI | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No.  18-502 |
| v. | ) | |
| | ) | |
| THE DOE RUN RESOURCES CORPORATION, | ) | |
| In its own capacity and on behalf of ST. JOE | ) | |
| MINERAL CORPORATION and ST. JOSEPH | ) | |
| LEAD COMPANY | ) | |
| | | |
| Defendant. | | |

## REMEDIAL DESIGN/REMEDIAL ACTION

## CONSENT DECREE

# TABLE OF CONTENTS

I.       BACKGROUND .............................................................................................. 1
II.      JURISDICTION .............................................................................................. 2
III.     PARTIES BOUND ........................................................................................... 2
IV.      DEFINITIONS ................................................................................................. 3
V.       GENERAL PROVISIONS ............................................................................... 8
VI.      PERFORMANCE OF THE WORK ................................................................ 9
VII.     REMEDY REVIEW ...................................................................................... 13
VIII.    PROPERTY REQUIREMENTS .................................................................... 13
IX.      FINANCIAL ASSURANCE .......................................................................... 14
X.       PAYMENTS FOR RESPONSE COSTS ....................................................... 17
XI.      INDEMNIFICATION AND INSURANCE ................................................... 20
XII.     CLAIMS AGAINST THE SUPERFUND ..................................................... 21
XIII.    FORCE MAJEURE ....................................................................................... 23
XIV.     DISPUTE RESOLUTION ............................................................................. 24
XV.      STIPULATED PENALTIES ......................................................................... 26
XVI.     COVENANTS BY PLAINTIFFS .................................................................. 29
XVII.    COVENANTS BY SD AND SFAs ............................................................... 32
XVIII.   EFFECT OF SETTLEMENT; CONTRIBUTION ......................................... 34
XIX.     ACCESS TO INFORMATION ...................................................................... 35
XX.      RETENTION OF RECORDS ........................................................................ 36
XXI.     OTHER OUTSTANDING ORDERS ............................................................ 37
XXII.    NOTICES AND SUBMISSIONS .................................................................. 38
XXIII.   RETENTION OF JURISDICTION ............................................................... 40
XXIV.    APPENDICES ............................................................................................... 40
XXV.     MODIFICATION .......................................................................................... 41
XXVI.    LODGING AND OPPORTUNITY FOR PUBLIC COMMENT ................... 41
XXVII.   SIGNATORIES/SERVICE ........................................................................... 41
XXVIII.  FINAL JUDGMENT ..................................................................................... 42

# I.      BACKGROUND

A.      The United States of America ("United States"), on behalf of the Administrator of the United States Environmental Protection Agency ("EPA"), filed a complaint in this matter pursuant to Sections 106 and 107 of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9606 and 9607.

B.      The United States in its complaint seeks, *inter alia*: (1) reimbursement of costs incurred by EPA and the Department of Justice ("DOJ") for response actions at the Big River Mine Tailings Superfund Site, St. Francois County, Missouri (the "Site"), together with accrued interest; and (2) performance of response actions by the defendant at the Site consistent with the National Contingency Plan, 40 C.F.R. Part 300 ("NCP").

C.      In accordance with the NCP and Section 121(f)(1)(F) of CERCLA, 42 U.S.C. § 9621(f)(1)(F), EPA notified the State of Missouri (the "State") on October 31, 2011, of negotiations with potentially responsible parties ("PRPs") regarding the implementation of the remedial design and remedial action ("RD/RA") for the Site, and EPA has provided the State with an opportunity to participate in such negotiations and be a party to this Consent Decree ("CD").

D.      The State has joined as co-Plaintiff in the United States' complaint.

E.      In accordance with Section 122(j)(1) of CERCLA, 42 U.S.C. § 9622(j)(1), EPA notified the Department of the Interior on October 31, 2011, of negotiations with PRPs regarding the release of hazardous substances that may have resulted in injury to the natural resources under federal trusteeship and encouraged the trustee to participate in the negotiation of this CD.

F.      The defendant that has entered into this CD ("Settling Defendant" or "SD") does not admit any liability to Plaintiffs arising out of the transactions or occurrences alleged in the complaint, nor does it acknowledge that the release or threatened release of hazardous substances at or from the Site constitutes an imminent and substantial endangerment to the public health or welfare or the environment. Settling Federal Agencies ("SFAs") do not admit any liability arising out of the transactions or occurrences alleged in any counterclaim asserted by SD.

G.      Pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605, EPA placed the Site on the National Priorities List ("NPL"), set forth at 40 C.F.R. Part 300, Appendix B, by publication in the Federal Register on October 14, 1992, 57 Fed. Reg. 47180.

H.      In response to a release or a substantial threat of a release of a hazardous substance at or from the Site, SD, on January 29, 1997, entered into Administrative Order on Consent for RI/FS,  Docket No. VII-97-F-0002, to conduct a Remedial Investigation and Feasibility Study ("RI/FS") for the Site pursuant to 40 C.F.R. § 300.430.

I.      Consistent with that Order on Consent, SD completed a Remedial Investigation ("RI") Report on March 3, 2006, and completed a Feasibility Study ("FS") Report on July 6, 2011.

J.      Pursuant to Section 117 of CERCLA, 42 U.S.C. § 9617, EPA published notice of the completion of the FS and of the proposed plan for remedial action on July 22, 2011, in a major local newspaper of general circulation. EPA provided an opportunity for written and oral comments from the public on the proposed plan for remedial action. A copy of the transcript of the public meeting is available to the public as part of the administrative record upon which the Director of the Superfund Division, EPA Region 7, based the selection of the response action for Operable Unit 01.

K.      The decision by EPA on the remedial action for Operable Unit 01 to be implemented at the Site is embodied in a Record of Decision ("ROD"), executed on September 30, 2011, on which the State has given its concurrence.  The ROD includes a responsiveness summary to the public comments. Notice of the final plan was published in accordance with Section 117(b) of CERCLA, 42 U.S.C. § 9617(b).

L.      Based on the information presently available to EPA and the State, EPA and the State believe that the Work will be properly and promptly conducted by the SD if conducted in accordance with this CD and its appendices.

M.      Solely for the purposes of Section 113(j) of CERCLA, 42 U.S.C. § 9613(j), the remedy set forth in the ROD and the Work to be performed by SD shall constitute a response action taken or ordered by the President for which judicial review shall be limited to the administrative record.

N.      On October 19, 2016, EPA issued a Unilateral Administrative Order (the 2016 UAO) to SD, requiring SD to implement a portion of the Remedial Action.  The 2016 UAO was issued with the Parties' knowledge of the continuing settlement negotiations in recognition of their mutual desire for the Remedial Action to commence before final agreement regarding this CD.

O.      The Parties recognize, and the Court by entering this CD finds, that this CD has been negotiated by the Parties in good faith and implementation of this CD will expedite the cleanup of the Site and will avoid prolonged and complicated litigation between the Parties, and that this CD is fair, reasonable, and in the public interest.

NOW, THEREFORE, it is hereby Ordered, Adjudged, and Decreed:

## II.    JURISDICTION

1.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1367, and 1345, and 42 U.S.C. §§ 9606, 9607, and 9613(b). This Court also has personal jurisdiction over SD. Solely for the purposes of this CD and the underlying complaints, SD waives all objections and defenses that it may have to jurisdiction of the Court or to venue in this District. SD shall not challenge the terms of this CD or this Court's jurisdiction to enter and enforce this CD.

## III.    PARTIES BOUND

2.      This CD is binding upon the United States and the State and upon SD and the SFAs and their successors, and assigns. Any change in ownership or corporate or other legal

2

status of SD including, but not limited to, any transfer of assets or real or personal property, shall in no way alter SD's responsibility under this CD.

3.      SD shall provide a copy of this CD to each contractor hired to perform the Work and to each person representing the SD with respect to the Site or the Work, and shall condition all contracts entered into hereunder upon performance of the Work in conformity with the terms of this CD. SD or its contractors shall provide written notice of the CD to all subcontractors hired to perform any portion of the Work. SD shall nonetheless be responsible for ensuring that its contractors and subcontractors perform the Work in accordance with the terms of this CD. With regard to the activities undertaken pursuant to this CD, each contractor and subcontractor shall be deemed to be in a contractual relationship with SD within the meaning of Section 107(b)(3) of CERCLA, 42 U.S.C. § 9607(b)(3).

## IV.   DEFINITIONS

4.      Unless otherwise expressly provided in this CD, terms used in this CD that are defined in CERCLA or in regulations promulgated under CERCLA shall have the meaning assigned to them in CERCLA or in such regulations. Whenever terms listed below are used in this CD or its appendices, the following definitions shall apply solely for purposes of this CD:

"Affected Property" shall mean all real property at the Site and any other real property where EPA determines, at any time, that access, land, water, or other resource use restrictions, and/or Institutional Controls are needed to implement the Remedial Action, including, but not limited to, Residential Properties within the Response Area.

"CD Properties Remaining to Be Sampled" shall mean the 3,648 Residential Properties within the Response Area that had not yet been sampled by EPA, SD, or another entity as of September 1, 2016, less the number of Residential Properties within the Response Area sampled after September 1, 2016.

"CD Properties to Be Remediated" shall mean the Residential Properties to be remediated by SD pursuant to this CD, determined according to the formula $X + Y - Z$, where:  X is the Known Properties Requiring Remediation; Y is the number of CD Properties Remaining to Be Sampled that, following sampling, are shown to exceed the Cleanup Level set forth in the ROD; and Z is the number of Properties to Be Remediated By Others.  Upon issuance by EPA of the Notice of Completion of the Work pursuant to Section XIX of the 2016 UAO, the number of CD Properties to Be Remediated shall be reduced by a further 155 Residential Properties.

"CERCLA" shall mean the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601-9675.

"Consent Decree" or "CD" shall mean this consent decree and all appendices attached hereto (listed in Section XXIV). In the event of conflict between this CD and any appendix, this CD shall control.

"Day" or "day" shall mean a calendar day. In computing any period of time under this CD, where the last day would fall on a Saturday, Sunday, or federal or State holiday, the period shall run until the close of business of the next working day.

"DOJ" shall mean the United States Department of Justice and its successor departments, agencies, or instrumentalities.

"Effective Date" shall mean the date upon which the approval of this CD is recorded on the Court's docket.

"EPA" shall mean the United States Environmental Protection Agency and its successor departments, agencies, or instrumentalities.

"EPA Hazardous Substance Superfund" shall mean the Hazardous Substance Superfund established by the Internal Revenue Code, 26 U.S.C. § 9507.

"MDNR" shall mean the Missouri Department of Natural Resources and any successor departments or agencies of MDNR.

"Future Response Costs" shall mean all costs, including, but not limited to, direct and indirect costs, that the United States incurs in reviewing or developing deliverables submitted pursuant to this CD, in overseeing implementation of the Work and 2016 UAO Work, or otherwise implementing, overseeing, or enforcing this CD, or otherwise in connection with Operable Unit 01, after the Effective Date.

"Hayden Creek Mining Area" shall mean the former mining site located one mile southwest of the town of Frankclay at 216 State Route M, Irondale, St. Francois County, Missouri. The Hayden Creek Mining Area is estimated to be approximately 50 acres in size and contains several old concrete structures that remain from former mining activities. The area of the former mining operations is approximately eight acres. MDNR completed a Preliminary Assessment/Removal Site Evaluation of the Hayden Creek Mining Area in September of 2011.

"Institutional Controls" or "ICs" shall mean Proprietary Controls and state or local laws, regulations, ordinances, zoning restrictions, or other governmental controls or notices that: (a) limit land, water, or other resource use to minimize the potential for human exposure to Waste Material at or in connection with the Site; (b) limit land, water, or other resource use to implement, ensure non-interference with, or ensure the protectiveness of the RA; and/or (c) provide information intended to modify or guide human behavior at or in connection with the Site.

"Interest" shall mean interest at the rate specified for interest on investments of the EPA Hazardous Substance Superfund, compounded annually on October 1 of each year, in accordance with 42 U.S.C. § 9607(a). The applicable rate of interest shall be the rate in effect at the time the interest accrues. The rate of interest is subject to change on October 1 of each year. Rates are available online at http://www2.epa.gov/superfund/superfund-interest-rates.

"Known Properties Requiring Remediation" shall mean the Residential Properties within the Response Area that EPA has identified as exceeding the Cleanup Level set forth in the ROD, that have not been remediated as of the Effective Date. As of September 1, 2016, there were 1,765 Known Properties Requiring Remediation.  This number shall be adjusted by adding the number of Residential Properties sampled by parties other than SD after September 1, 2016 that exceed the Cleanup Level set forth in the ROD, and by subtracting the number of Residential Properties remediated by parties other than SD between September 1, 2016 and the Effective

4

Date, but shall not be adjusted by the number of Residential Properties remediated by the SD between September 1, 2016 and the Effective Date.

"Leadwood Soil Repository" shall mean the former mining site located west and south of the City of Leadwood, St. Francois County, Missouri. The Leadwood Soil Repository can be located on the Flat River 7.5-Minute U.S. Geological Survey ("USGS") quadrangle map in Sections 4, 5, 8, 9, and 16 Township 36 North, Range 4 East in St. Francois County, Missouri.

"The Big River Mine Tailings Special Account" shall mean the special account, within the EPA Hazardous Substance Superfund, established for the Site by EPA pursuant to Section 122(b)(3) of CERCLA, 42 U.S.C. § 9622(b)(3).

"National Contingency Plan" or "NCP" shall mean the National Oil and Hazardous Substances Pollution Contingency Plan promulgated pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605, codified at 40 C.F.R. Part 300, and any amendments thereto.

"Non-Settling Owner" shall mean any person, other than SD, that owns or controls any Affected Property. The clause "Non-Settling Owner's Affected Property" means Affected Property owned or controlled by Non-Settling Owner.

"Operable Unit 01" shall mean Residential Properties located within the Site.

"Operation and Maintenance" or "O&M" shall mean all activities required to operate, maintain, and monitor the effectiveness of the RA as specified in the SOW or any EPA-approved O&M Plan.

"Paragraph" or "¶" shall mean a portion of this CD identified by an Arabic numeral or an upper or lower case letter.

"Parties" shall mean the United States, the State of Missouri, and SD.

"Past Response Costs" shall mean all costs, including, but not limited to, direct and indirect costs, that the United States paid in connection with Operable Unit 01 at the Site through the Effective Date.

"Performance Standards" or "PS" shall mean the cleanup levels and other measures of achievement of the remedial action objectives, as set forth in the ROD.

"Plaintiffs" shall mean the United States and the State of Missouri.

"Properties to Be Remediated By Others" shall mean Residential Properties within the Response Area that exceed the Cleanup Level that, after the Effective Date, will be remediated by entities other than SD.  As of September 1, 2016, there were 732 Properties to Be Remediated By Others.  This number shall be reduced by the number of Residential Properties within the Response Area remediated by entities other than SD between September 1, 2016 and the Effective Date.

"Proprietary Controls" shall mean easements or covenants running with the land that (a) limit land, water, or other resource use and/or provide access rights and (b) are created pursuant

to common law or statutory law by an instrument that is recorded in the appropriate land records office.

"RCRA" shall mean the Solid Waste Disposal Act, 42 U.S.C. §§ 6901-6992 (also known as the Resource Conservation and Recovery Act).

"Record of Decision" or "ROD" shall mean the EPA Record of Decision relating to the Operable Unit 01, Residential Properties at the Site signed on September 30, 2011, by the Director of the Superfund Division, EPA Region 7, and all attachments thereto. The ROD is attached as Appendix A.

"Reimbursable Future Response Costs" shall mean those Future Response Costs that SD is required to reimburse to the United States pursuant to Paragraphs 11, 17, and 21.d.

"Reimbursable State Future Response Costs" shall mean those Future Response Costs that SD is required to reimburse to the State pursuant to Paragraphs 11 and 21.d

"Related Orders" shall mean the following orders:

> Administrative Order on Consent, Docket No. CERCLA-7-2000-0015
>
> Administrative Order on Consent, Docket No. CERCLA 07-97-F-007
>
> Administrative Order on Consent, Docket No. CERCLA 07-97-F-009
>
> Administrative Order on Consent, Docket No. CERCLA 07-2000-0022
>
> Administrative Order on Consent, Docket No. CERCLA 07-98-F-0007
>
> Administrative Order on Consent, Docket No. CERCLA 07-2000-0023
>
> Administrative Order on Consent, Docket No. CERCLA 07-2000-0024
>
> Administrative Order on Consent, Docket No. CERCLA 07-2000-0025
>
> Administrative Order on Consent, Docket No. CERCLA 07-2004-0167
>
> Administrative Order on Consent, Docket No. VII-94-F-0015
>
> Unilateral Administrative Order, Docket No. CERCLA 07-2005-0169
>
> Unilateral Administrative Order, Docket No. CERCLA 07-2005-0272
>
> Unilateral Administrative Order, Docket No. CERCLA 07-2006-0231

"Remedial Action" or "RA" shall mean the remedial action selected in the ROD.

"Remedial Design" or "RD" shall mean those activities to be undertaken by SD to develop final plans and specifications for the RA as stated in the SOW.

"Residential Properties" shall mean properties that contain single and multi-family dwellings, apartment complexes, vacant lots in residential areas, schools, daycare centers, playgrounds, parks and green ways.

"Response Area" shall mean the area within one mile of chat and tailings waste at each of the mine waste areas in St. Francois County, including: Desloge; Doe Run; Elvins (Rivermines); Federal; Leadwood; and, National, and as depicted on Figure 1 of the ROD (attached to this CD as Appendix F).

"Section" shall mean a portion of this CD identified by a Roman numeral.

"Settling Defendant" or "SD" shall mean The Doe Run Resources Corporation, in its own capacity and on behalf of its predecessors, including the St. Joe Mineral Corporation and the St. Joseph Lead Company.

"SD's Future Response Costs" shall mean the necessary costs of response consistent with the NCP that SD incurs and pays at Operable Unit 01, after the Effective Date, including, but not limited to costs that the SD incurs implementing the Work, the 2016 UAO Work, any Reimburseable Future Response Costs that Settling Defendant pays to EPA under Paragraph 24 of this Consent Decree, and any Reimburseable State Future Response Costs that Settling Defendant pays to the State under Paragraph 26 of this Consent Decree.

"SD's Past Response Costs" shall mean the necessary costs of response consistent with the NCP that the SD incurred at or in connection with the Site, prior to and including the Effective Date, including, but not limited to, costs that SD incurred implementing the 2016 UAO Work, but excluding costs that SD incurred related to Operable Unit 02 at the Site.

"Settling Federal Agencies" or "SFAs" shall mean the Department of Defense, Department of the Treasury, Department of the Interior, and Department of the Army and their successor departments, agencies, or instrumentalities.

"Site" shall mean the Big River Mine Tailings Superfund Site, located in St. Francois County, Missouri, and depicted generally on the map attached as Appendix C.  The boundaries of the "Site" are coextensive with the boundaries of St. Francois County.

"State" shall mean the State of Missouri.

"State Future Response Costs" shall mean all costs, including, but not limited to, direct and indirect costs, that the State incurs in reviewing or developing deliverables submitted pursuant to this CD, in overseeing implementation of the Work and 2016 UAO Work, or otherwise implementing, overseeing, or enforcing this CD, or otherwise in connection with Operable Unit 01, after the Effective Date.

"State Past Response Costs" shall mean all costs, including, but not limited to, direct and indirect costs, that the State paid in connection with Operable Unit 01 at the Site through the Effective Date.

"Statement of Work" or "SOW" shall mean the document describing the activities SD must perform to implement the RD, the RA, and O&M regarding the Site, which is attached as Appendix B.

"Supervising Contractor" shall mean the principal contractor retained by SD to supervise and direct the implementation of the Work under this CD.

"Transfer" shall mean to sell, assign, convey, lease, mortgage, or grant a security interest in, or where used as a noun, a sale, assignment, conveyance, or other disposition of any interest by operation of law or otherwise.

"United States" shall mean the United States of America and each department, agency, and instrumentality of the United States, including EPA, and the SFAs.

"2016 UAO" shall mean the Unilateral Administrative Order issued by EPA on October 19, 2016 with number CERCLA-07-2017-0001.

"2016 UAO Work" shall mean all activities and obligations that SD is required to perform under the 2016 UAO.

"Waste Material" shall mean (1) any "hazardous substance" under Section 101(14) of CERCLA, 42 U.S.C. § 9601(14); (2) any pollutant or contaminant under Section 101(33) of CERCLA, 42 U.S.C. § 9601(33); (3) any "solid waste" under Section 1004(27) of RCRA, 42 U.S.C.§ 6903(27); and (4) any "hazardous substance" under Sections 260.360 and 260.500 Revised Statutes of Missouri ("RSMo").

"Work" shall mean all activities and obligations SD is required to perform under this CD, except the activities required under Section XX (Retention of Records).  Work does not include 2016 UAO Work or activities undertaken in compliance with SOW Section 8 (Related Orders).

## V.   GENERAL PROVISIONS

5.      **Objectives of the Parties**. The objectives of the Parties in entering into this CD are to protect public health or welfare or the environment by the implementation of response actions for Operable Unit 01 at the Site and at the Hayden Creek Mining Area by SD, and to resolve the claims of Plaintiffs for Operable Unit 01 of the Site and for the Hayden Creek Mining Area against SD, potential administrative actions of EPA and the claims of the State of Missouri for Operable Unit 01 of the Site and for the Hayden Creek Mining Area against the SFAs, and the claims of SD that have been or could have been asserted against the United States and the State with regard to Operable Unit 01 of the Site, the Hayden Creek Mining Area, and SD's Past Response Costs as provided in this CD.

6.      **Commitments by SD and SFAs**. SD shall finance and perform the Work in accordance with this CD and all deliverables developed by SD and approved or modified by EPA pursuant to this CD. SD shall pay the United States for its Reimbursable Future Response Costs and the State for its Reimbursable State Future Response Costs as provided in this CD. The United States, on behalf of the SFAs, shall pay SD for its response costs, as provided in this CD.

7.      **Compliance with Applicable Law**. Nothing in this CD limits SD's obligations to comply with the requirements of all applicable federal and state laws and regulations. SD must also comply with all applicable or relevant and appropriate requirements of all federal and state environmental laws as set forth in the ROD and the SOW. The activities conducted pursuant to

8

this CD, if approved by EPA, shall be deemed to be consistent with the NCP as provided in Section 300.700(c)(3)(ii) of the NCP.

8.      **Permits**.

a.      As provided in Section 121(e) of CERCLA, 42 U.S.C. § 9621(e), and Section 300.400(e) of the NCP, no permit shall be required for any portion of the Work conducted entirely on-site (i.e., within the areal extent of contamination or in very close proximity to the contamination and necessary for implementation of the Work). Where any portion of the Work that is not on-site requires a federal or state permit or approval, SD shall submit timely and complete applications and take all other actions necessary to obtain all such permits or approvals.

b.      SD may seek relief under the provisions of Section XIII (Force Majeure) for any delay in the performance of the Work resulting from a failure to obtain, or a delay in obtaining, any permit or approval referenced in ¶ 8.a and required for the Work, provided that it has submitted timely and complete applications and taken all other actions necessary to obtain all such permits or approvals.

c.      This CD is not, and shall not be construed to be, a permit issued pursuant to any federal or state statute or regulation.

# VI.      PERFORMANCE OF THE WORK

9.      **Coordination and Supervision**.

a.      **Project Coordinators.**

(1)      SD's Project Coordinator must have sufficient technical expertise to coordinate the Work. SD's Project Coordinator may not be an attorney representing SD in this matter and may not act as the Supervising Contractor. SD's Project Coordinator may assign other representatives, including other contractors, to assist in coordinating the Work.

(2)      EPA shall designate and notify the SD of EPA's Project Coordinator and Alternate Project Coordinator. EPA may designate other representatives, which may include its employees, contractors and/or consultants, to oversee the Work. EPA's Project Coordinator/Alternate Project Coordinator will have the same authority as a remedial project manager and/or an on-scene coordinator, as described in the NCP. This includes the authority to halt the Work and/or to conduct or direct any necessary response action when he or she determines that conditions at the Site constitute an emergency or may present an immediate threat to public health or welfare or the environment due to a release or threatened release of Waste Material.

(3)      The State shall designate and notify EPA and the SD of its Project Coordinator[s] and Alternate Project Coordinator[s]. The State may designate other representatives, including its employees, contractors and/or consultants to oversee the Work. For any meetings and inspections in which EPA's Project Coordinator

participates, the State's Project Coordinator also may participate. SDs shall notify the State reasonably in advance of any such meetings or inspections.

(4)     SD's Project Coordinators shall meet or confer by telephone with EPA's and the State's Project Coordinators monthly, or as otherwise mutually agreed among the Project Coordinators.

b.     **Supervising Contractor**. SD's proposed Supervising Contractor must have sufficient technical expertise to supervise the Work and a quality assurance system that complies with ANSI/ASQC E4-2004, Quality Systems for Environmental Data and Technology Programs: Requirements with Guidance for Use (American National Standard).

c.     **Procedures for Disapproval/Notice to Proceed.**

(1)     SD shall designate, and notify EPA, within 10 days after the Effective Date, of the names, contact information, and qualifications of the SD's proposed Project Coordinator and Supervising Contractor.

(2)     EPA, after a reasonable opportunity for review and comment by the State, shall issue notices of disapproval and/or authorizations to proceed regarding the proposed Project Coordinator and Supervising Contractor, as applicable. If EPA issues a notice of disapproval, SD shall, within 30 days, submit to EPA a list of supplemental proposed Project Coordinators and/or Supervising Contractors, as applicable, including a description of the qualifications of each. EPA shall issue a notice of disapproval or authorization to proceed regarding each supplemental proposed coordinator and/or contractor. SD may select any coordinator/contractor covered by an authorization to proceed and shall, within 21 days, notify EPA of SD's selection.

(3)     SD may change its Project Coordinator and/or Supervising Contractor, as applicable, by following the procedures of ¶¶ 9.c(1) and 9.c(2).

(4)     Notwithstanding the procedures of ¶¶ 9.c(1) through 9.c(3), SD has proposed, and EPA has authorized SD to proceed, regarding the following Project Coordinator and Supervising Contractor:

Project Coordinator

Chris Neaville
Asset Development Director
The Doe Run Company
Suite 300
1801 Park 270 Drive
St. Louis, MO  63146

Supervising Contractor

AMEC Foster Wheeler plc
15933 Clayton Rd
Ballwin, MO  63011

10.     **Performance of Work**.

a.      **Performance of Work in Accordance with SOW.**  SD shall: perform the RA and operate, maintain, and monitor the effectiveness of the RA; all in accordance with the SOW and all EPA-approved, conditionally-approved, or modified deliverables as required by the SOW. The SOW shall require SD to complete the provisions of this Paragraph on all Affected Properties, including, not later than the end of the thirteenth calendar year after the Effective Date, sampling of all CD Properties Remaining to Be Sampled, and remediation of all CD Properties to Be Remediated; provided that SD shall not be required to attempt to gain access to a number of Residential Properties greater than the number of CD Properties to be Sampled or to perform remediation on Residential Properties other than the CD Properties to be Remediated. SD shall perform remediation on CD Properties to Be Remediated according to the schedule set forth in the SOW.  All deliverables required to be submitted for approval under the CD or SOW shall be subject to approval by EPA in accordance with ¶ 6.6 (Approval of Deliverables) of the SOW.

b.      **Performance of Work Related to Hayden Creek Mining Area.**  Subject to obtaining necessary access, SD agrees to address all Site contamination at the Hayden Creek Mining Area to health-based cleanup levels appropriate for the future use of the property.  SD shall submit a Work Plan in accordance with Appendix H for approval by EPA and the State not later than two years after the Effective Date.  The Work Plan shall address the identification of all sources of Site contamination at the Hayden Creek Mining Area; provide recommendations for an appropriate response action to address sources of Site contamination at the Hayden Creek Mining Area; and provide a schedule for completion of the investigation and completion of the response action.  The Work Plan shall require SD to complete the response action for the Hayden Creek Mining Area not later than five years after the Effective Date or three years after EPA's approval of the Work Plan, whichever is later. All deliverables submitted for EPA approval or EPA comment pursuant to this Paragraph or the Work Plan for the Hayden Creek Mining Area shall be subject to Section 6 (Deliverables) of the SOW.

c.      **Notification to Doe Run Regarding Properties Requiring Remediation and Sampling.**  Not later than thirty days after the Effective Date, EPA shall identify and provide to SD the list of Known Properties Requiring Remediation and the number of CD Properties Remaining to Be Sampled and Properties to Be Remediated By Others.

d.      **Leadwood Soil Repository**.

(1)      SD agrees to allow, free of charge, EPA and its contractors access to and use of the Leadwood Soil Repository for disposal of lead contaminated residential yard soils from the Site, until the end of the thirteenth year after the Effective Date, provided that such use leaves sufficient capacity for SD to use the Leadwood Soil Repository for disposal of soils generated by SD under the 2016 UAO and this CD.  SD shall provide an annual update of the estimated capacity of each of its soil repositories, including the Leadwood Soil Repository. This information shall be included in the revised RA Construction Schedule.  EPA and its contractors will be responsible for the day-to-day control and management of the portion of the Leadwood Soil Repository that they use, during the period of such use.  SD shall be responsible for such control and

management of the Leadwood Soil Repository, consistent with the Repository Operation Plan, upon the conclusion of its use by EPA and its contractors and for the long-term operation and maintenance of the Leadwood Soil Repository, consistent with an approved O&M Plan, after the completion of the Work.

(2)     SD shall notify EPA as soon as practicable if it determines that the Leadwood Soil Repository lacks, or will lack, sufficient capacity to accommodate both SD's disposal of soils generated by SD under the 2016 UAO and this CD and disposal of Site soils by EPA or its contractors.  SD's notice shall include available information demonstrating that the repository will lack sufficient capacity to accommodate both EPA's and SD's projected needs with regard to Site soils.  SD and EPA shall confer regarding SD's notice to identify potential solutions.

(3)     Within thirty (30) days after such notice, EPA shall decide whether it will continue unchanged, reduce, or eliminate entirely the use of the Leadwood Soil Repository for disposal of Site soils by EPA and its contractors, and provide notice of such decision to SD.

(4)     EPA's decision under Paragraph 10.d(3) shall be subject to Dispute Resolution.  If SD initiates Dispute Resolution, EPA and its contractors shall cease using the Leadwood Soil Repository during the pendency of the dispute.

11.     **Emergencies and Releases**. SD shall comply with the emergency and release response and reporting requirements under ¶ 4.4 (Emergency Response and Reporting) of the SOW. Subject to Section XVI (Covenants by Plaintiffs), nothing in this CD, including ¶ 4.4 of the SOW, limits any authority of Plaintiffs: (a) to take all appropriate action to protect human health and the environment or to prevent, abate, respond to, or minimize an actual or threatened release of Waste Material on, at, or from the Site, or (b) to direct or order such action, or seek an order from the Court, to protect human health and the environment or to prevent, abate, respond to, or minimize an actual or threatened release of Waste Material on, at, or from the Site. If, due to SD's failure to take appropriate response action under ¶ 4.4 of the SOW, EPA or, as appropriate, the State takes such action instead, SD shall reimburse EPA and the State under Section X (Payments for Response Costs) for all costs of the response action.

12.     **Community Involvement**. If requested by EPA, SD shall conduct community involvement activities under EPA's oversight as provided for in, and in accordance with, Section 2 (Community Involvement) of the SOW. Such activities may include, but are not limited to, designation of a Community Involvement Coordinator and development of a Health Education Program.

13.     **Modification of SOW or Related Deliverables**.

a.     If EPA determines that it is necessary to modify the work specified in the SOW and/or in deliverables developed under the SOW in order to achieve and/or maintain the Performance Standards or to carry out and maintain the effectiveness of the RA, and such modification is consistent with the Scope of the Remedy set forth in ¶ 1.3 of the SOW, then EPA

may notify SD of such modification. If SD objects to the modification it may, within 30 days after EPA's notification, seek dispute resolution under Section XIV.

b.    The SOW and/or related work plans shall be modified: (1) in accordance with the modification issued by EPA; or (2) if SD invokes dispute resolution, in accordance with the final resolution of the dispute. The modification shall be incorporated into and enforceable under this CD, and SD shall implement all work required by such modification. SD shall incorporate the modification into the deliverable required under the SOW, as appropriate.

c.    Nothing in this Paragraph shall be construed to limit EPA's authority to require performance of further response actions as otherwise provided in this CD.

14.    Nothing in this CD, the SOW, or any deliverable required under the SOW constitutes a warranty or representation of any kind by Plaintiffs that compliance with the work requirements set forth in the SOW or related deliverable will achieve the Performance Standards.

## VII.   REMEDY REVIEW

15.    **Periodic Review**. SD shall conduct, in accordance with ¶ 4.7 (Periodic Review Support Plan) of the SOW, studies and investigations to support EPA's reviews under Section 121(c) of CERCLA, 42 U.S.C. § 9621(c), and applicable regulations, of whether the RA is protective of human health and the environment.

## VIII.   PROPERTY REQUIREMENTS

16.    **Agreements Regarding Access and Non-Interference.** SD shall, with respect to any Non-Settling Owner's Affected Property, use best efforts to secure from such Non-Settling Owner an agreement, enforceable by SD and by Plaintiffs, providing that such Non-Settling Owner (i) provide Plaintiffs, their representatives, contractors, and subcontractors with access at all reasonable times to such Affected Property to conduct any activity regarding the CD, including those listed in ¶ 16.a (Access Requirements); and (ii) refrain from using such Affected Property in any manner that EPA determines will pose an unacceptable risk to human health or to the environment due to exposure to Waste Material, or interfere with or adversely affect the implementation, integrity, or protectiveness of the Remedial Action.

a.    **Access Requirements**. The following is a list of activities for which access is required regarding the Affected Property:

(1)    Conducting and Monitoring the Work;

(2)    Verifying any data or information submitted to the United States or the State;

(3)    Conducting investigations regarding contamination at or near the Site;

(4)    Obtaining samples;

(5)    Assessing the need for, planning, or implementing additional response actions at or near the Site;

13

(6)     Assessing implementation of quality assurance and quality control practices as defined in the approved construction quality assurance quality control plan as provided in the SOW;

(7)     Implementing the Work pursuant to the conditions set forth in ¶ 63 (Work Takeover);

(8)     Inspecting and copying records, operating logs, contracts, or other documents maintained or generated by SD or its agents, consistent with Section XIX (Access to Information);

(9)     Assessing SD's compliance with the CD;

(10)     Determining whether the Affected Property is being used in a manner that is prohibited or restricted, or that may need to be prohibited or restricted under the CD; and

(11)     Implementing, monitoring, maintaining, reporting on, and enforcing any land, water, or other resource use restrictions and Institutional Controls.

17.     **Best Efforts**. As used in this Section, "best efforts" means the efforts that a reasonable person in the position of SD would use so as to achieve the goal in a timely manner, including the cost of employing professional assistance and the payment of reasonable sums of money to secure access and/or use restriction. If SD is unable to accomplish what is required through "best efforts" in a timely manner, it shall notify the EPA and include a description of the steps taken to comply with the requirements. If the EPA deems it appropriate, it may assist SD, or take independent action, in obtaining such access and/or use restrictions. SD shall reimburse all costs incurred by the United States or State in providing such assistance or taking such action, including the cost of attorney time and the amount of monetary consideration or just compensation paid, and such costs shall constitute Reimbursable Future Response Costs to be reimbursed under Section X (Payments for Response Costs).

## IX.   FINANCIAL ASSURANCE

18.     In order to ensure completion of the Work, SD shall secure financial assurance for the benefit of EPA, initially in the amount of $1,000,000 and ultimately in the amount of $35,800,000, in the amounts and by the dates set forth in Appendix D. The financial assurance must be one or more of the mechanisms listed below, in a form substantially identical to the relevant sample documents available from the "Financial Assurance" category on the Cleanup Enforcement Model Language and Sample Documents Database at http://cfpub.epa.gov/compliance/models/, and satisfactory to EPA. SDs may use multiple mechanisms as long as they are limited to surety bonds guaranteeing payment, letters of credit, trust funds, and/or insurance policies.

a.     A surety bond guaranteeing payment and/or performance of the Work that is issued by a surety company among those listed as acceptable sureties on federal bonds as set forth in Circular 570 of the U.S. Department of the Treasury;

b.      An irrevocable letter of credit, payable to or at the direction of EPA, that is issued by an entity that has the authority to issue letters of credit and whose letter-of-credit operations are regulated and examined by a federal or state agency;

c.      A trust fund established for the benefit of EPA that is administered by a trustee that has the authority to act as a trustee and whose trust operations are regulated and examined by a federal or state agency.  SD shall make deposits to the trust fund in accordance with the schedule set forth in Appendix D, provided, however, that the Amount of Deposit for each required deposit shall equal the lesser of 1) the Amount of Deposit identified in Appendix D or 2) the difference between the Principal Balance in Trust After Deposit identified in Appendix D corresponding to that deposit and the principal amount of funds in the trust (i.e., balance exclusive of any interest earned to date) at the time the deposit is due.  SD may make its annual deposits in two equal parts as set forth in Appendix D.

d.      A policy of insurance that provides EPA with acceptable rights as a beneficiary thereof and that is issued by an insurance carrier that has the authority to issue insurance policies in the applicable jurisdiction(s) and whose insurance operations are regulated and examined by a federal or state agency;

19.     As set forth above and in Appendix D, SD has selected, and EPA has found satisfactory, as an initial financial assurance a trust fund in the form attached as Appendix G. Within 30 days after the Effective Date, SD shall secure all executed and/or otherwise finalized mechanisms or other documents consistent with the form of financial assurance attached as Appendix G and shall submit such mechanisms and documents to the Regional Financial Management Officer, to the United States, and to EPA and the State as specified in Section XXI (Notices and Submissions).

20.     SD shall diligently monitor the adequacy of the financial assurance. If SD becomes aware of any information indicating that the financial assurance provided under this Section is inadequate or otherwise no longer satisfies the requirements of this Section, SD shall notify EPA of such information within 7 days of such discovery. If EPA determines that the financial assurance provided under this Section is inadequate or otherwise no longer satisfies the requirements of this Section, EPA will notify the affected SD of such determination. SD shall, within 30 days after notifying EPA or receiving notice from EPA under this Paragraph, secure and submit to EPA for approval a proposal for a revised or alternative financial assurance mechanism that satisfies the requirements of this Section. EPA may extend this deadline for such time as is reasonably necessary for SD, in the exercise of due diligence, to secure and submit to EPA a proposal for a revised or alternative financial assurance mechanism, not to exceed 60 days. SD shall follow the procedures of ¶ 22 (Modification of Financial Assurance) in seeking approval of, and submitting documentation for, the revised or alternative financial assurance mechanism. SD's inability to secure and submit to EPA financial assurance in accordance with this Section shall in no way excuse performance of any other requirements of this CD, including,

without limitation, the obligation of SD to complete the Work in accordance with the terms of this CD.

21.    **Access to Financial Assurance**.

a.    If EPA issues a notice of implementation of a Work Takeover under ¶ 63.b, then, in accordance with any applicable financial assurance mechanism EPA is entitled to: (1) the performance of the Work; and/or (2) require that any funds guaranteed be paid in accordance with ¶ 21.c.

b.    If EPA is notified by the issuer of a financial assurance mechanism that it intends to cancel such mechanism, and SD fails to provide an alternative financial assurance mechanism in accordance with this Section at least 30 days prior to the cancellation date, the funds guaranteed under such mechanism must be paid prior to cancellation in accordance with ¶ 21.c. If, upon issuance of a notice of implementation of a Work Takeover under ¶ 63.b, EPA is unable for any reason to promptly secure the resources guaranteed under any applicable financial assurance mechanism then EPA may demand an amount, as determined by EPA, sufficient to cover 60 percent of the cost to EPA of the remaining Work to be performed. SD shall, within 30 days of such demand, pay the amount demanded as directed by EPA.

c.    Any amounts required to be paid under this ¶ 21 shall be, as directed by EPA: (i) paid to EPA in order to facilitate the completion of the Work by EPA or by another person; or (ii) deposited into an interest-bearing account, established at a duly chartered bank or trust company that is insured by the FDIC, in order to facilitate the completion of the Work by another person. If payment is made to EPA, EPA may deposit the payment into the EPA Hazardous Substance Superfund or into the Big River Mine Tailings Superfund Site Special Account within the EPA Hazardous Substance Superfund to be retained and used to conduct or finance response actions at or in connection with the Site, or to be transferred by EPA to the EPA Hazardous Substance Superfund.

d.    All EPA Work Takeover costs and State Work Takeover costs not paid under this ¶ 21 must be reimbursed as Reimbursable Future Response Costs and/or State Reimbursable Future Response Costs under Section X (Payments for Response Costs).

22.    **Modification of Amount, Form, or Terms of Financial Assurance**.

a.    SD may submit, on any anniversary of the Effective Date or at any other time agreed to by the Parties, but not more often than once per calendar year, a request to reduce the amount, or change the form or terms, of the financial assurance mechanism. Any such request must be submitted to EPA in accordance with ¶ 18, and must include an estimate of the cost of the remaining Work, an explanation of the bases for the cost calculation, and a description of the proposed changes, if any, to the form or terms of the financial assurance.

b.    EPA will notify SD of its decision to approve or disapprove a requested reduction or change pursuant to this Paragraph. If EPA determines that the SD has demonstrated that 60% of the estimated costs of the remaining Work (based on the number of CD Properties Remaining To be Remediated) is less than the balance of the financial assurance trust fund created pursuant to Section IX, EPA shall approve a requested reduction in an amount equal to

16

the difference shown.  SD may reduce the amount of the financial assurance mechanism only in accordance with: (a) EPA's approval, which will not be unreasonably withheld, conditioned or delayed; or (b) if there is a dispute, the agreement, final administrative decision, or final judicial decision resolving such dispute under Section XIV (Dispute Resolution). Any decision made by EPA on a request submitted under this Paragraph to change the form or terms of a financial assurance mechanism, not including a request to reduce the amount of financial assurance, shall be made in EPA's sole and unreviewable discretion, and such decision shall not be subject to challenge by SD pursuant to the dispute resolution provisions of this CD or in any other forum. Within 30 days after receipt of EPA's approval of, or the agreement or decision resolving a dispute relating to, the requested modifications pursuant to this Paragraph, SD shall submit to EPA documentation of the reduced, revised, or alternative financial assurance mechanism in accordance with ¶ 19.

23.     **Release, Cancellation, or Discontinuation of Financial Assurance**. SD may release, cancel, or discontinue any financial assurance provided under this Section only: (a) if EPA issues a Certification of Work Completion under ¶ 4.8 (Certification of Work Completion) of the SOW; (b) in accordance with EPA's approval of such release, cancellation, or discontinuation; or (c) if there is a dispute regarding the release, cancellation or discontinuance of any financial assurance, in accordance with the agreement, final administrative decision, or final judicial decision resolving such dispute under Section XIV (Dispute Resolution).

## X.     PAYMENTS FOR RESPONSE COSTS

24.     **Payments by SD for Future Response Costs**. SD shall pay to EPA those Reimbursable Future Response Costs not inconsistent with the NCP, only as required to be paid and expressly set forth in this CD.  Any EPA demand for reimbursement of Reimbursable Future Response Costs shall be accompanied by an Itemized Cost Summary, which includes direct and indirect costs incurred by EPA, its contractors, subcontractors, and DOJ.

25.     **Deposit of Future Response Costs Payments**. The total amount to be paid by SD as reimbursement of Reimbursable Future Response Costs shall be deposited by EPA in the Big River Mine Tailings Superfund Special Account to be retained and used to conduct or finance response actions at or in connection with the Site, or to be transferred by EPA to the EPA Hazardous Substance Superfund, provided, however, that EPA may deposit a Future Response Costs payment directly into the EPA Hazardous Substance Superfund if, at the time the payment is received, EPA estimates that the Big River Mine Tailings Superfund Site Special Account balance is sufficient to address currently anticipated future response actions to be conducted or financed by EPA at or in connection with the Site. Any decision by EPA to deposit a Future Response Costs payment directly into the EPA Hazardous Substance Superfund for this reason shall not be subject to challenge by SD pursuant to the dispute resolution provisions of this CD or in any other forum.

26.     **Payments by SD to State**. SD shall pay to the State those Reimbursable State Future Response Costs not inconsistent with the NCP, only as required to be paid and expressly set forth in this Decree. The State will send SD a bill requiring payment that includes a State-prepared cost summary, accompanied by documentation not inconsistent with the NCP, which includes direct and indirect costs incurred by the State and its contractors on a periodic basis. SD

shall make payments of all undisputed costs within 30 days after SD's receipt of each bill requiring payment, except as otherwise provided in ¶ 28 (Contesting Future Response Costs).

      27.    **Payment Instructions for SD**.

        a.    Future Response Costs Payment and Stipulated Penalties. For payments to the United States:

        (1)    For all payments subject to this ¶ 27.a, SD shall make such payment by Automated Clearinghouse (ACH) payment as follows:

> PNC Bank
> 808 17th Street, NW
> Washington, DC 20074
> Contact ʙ Jesse White 301-887-6548
> ABA = 051036706
> Transaction Code 22 - checking
> Environmental Protection Agency
> Account 310006
> CTX Format

        (2)    For all payments made under this ¶ 27.a, SD must include references to the Site/Spill ID and DJ numbers. At the time of any payment required to be made in accordance with ¶ 27.a, SD shall send notices that payment has been made to the United States, EPA, and the EPA Cincinnati Finance Center, all in accordance with ¶ 90. All notices must include references to the Site/Spill ID and DJ numbers.

        b.    For all payments to the State pursuant to Paragraph 26, SD shall pay by certified or cashier's check payable to the "Treasurer, State of Missouri (Hazardous Waste Fund)" referencing the name and address of the party making the payment, EPA Site/Spill ID Number, and sent to:

> Chief, Superfund Section
> Hazardous Waste Program
> Missouri Department of Natural Resources
> P.O. Box 176
> Jefferson City, MO 65102

        c.    For all payments to the State under Section XV (Stipulated Penalties), SD shall make payment by certified check or cashier's check made payable to the "Treasurer, State of Missouri (St. Francois County School Fund)" referencing the name and address of the party making the payment, EPA Site/Spill ID Number, and sent to

> JoAnn Horvath, or designee
> Financial Services
> Missouri Attorney General's Office
> P.O. Box 899
> Jefferson City, MO 65102

28.     **Contesting Future Response Costs**. SD may submit a Notice of Dispute, initiating the procedures of Section XIV (Dispute Resolution), regarding any Reimbursable Future Response Costs or any Reimbursable State Future Response Costs billed under ¶ 24 (Payments by SD for Future Response Costs) or under ¶ 26 (Payments by SD to State) if SD determines that EPA or the State has made a mathematical error or included a cost item that is not within the definition of Reimbursable Future Response Costs or Reimbursable State Future Response Costs, or if SD believes EPA or the State incurred excess costs as a direct result of an EPA or State action that was inconsistent with a specific provision or provisions of the NCP. Such Notice of Dispute shall be submitted in writing within 30 days after receipt of the bill and must be sent to the United States (if the United States' accounting is being disputed) or the State (if the State's accounting is being disputed) pursuant to Section XXI (Notices and Submissions). Such Notice of Dispute shall specifically identify the contested Reimbursable Future Response Costs or Reimbursable State Future Response Costs and the basis for objection. If SD submits a Notice of Dispute, SD shall within the 30-day period, also as a requirement for initiating the dispute, (a) pay all uncontested Reimbursable Future Response Costs to the United States and all uncontested Reimbursable State Future Response Costs to the State, and, if the amount in dispute exceeds $25,000 (b) establish, in a duly chartered bank or trust company, an interest-bearing escrow account that is insured by the Federal Deposit Insurance Corporation (FDIC), and remit to that escrow account funds equivalent to the amount of the contested Future Response Costs or State Future Response Costs. SD shall send to the United States or the State, as appropriate, as provided in Section XXI (Notices and Submissions), a copy of the transmittal letter and check paying the uncontested Future Response Costs or State Future Response Costs, and a copy of the correspondence that establishes and funds the escrow account, including, but not limited to, information containing the identity of the bank and bank account under which the escrow account is established as well as a bank statement showing the initial balance of the escrow account. If the United States or the State prevails in the dispute, SD shall pay the sums due (with accrued interest) to the United States or the State, if State costs are disputed, within 7 days after the resolution of the dispute. If SD prevails concerning any aspect of the contested costs, SD shall pay that portion of the costs (plus associated accrued interest) for which it did not prevail to the United States or the State, if State costs are disputed, within 7 days after the resolution of the dispute. SD shall be disbursed any balance of the escrow account. All payments to the United States under this Paragraph shall be made in accordance with ¶ 27.a (instructions for future response cost payments). The dispute resolution procedures set forth in this Paragraph in conjunction with the procedures set forth in Section XIV (Dispute Resolution) shall be the exclusive mechanisms for resolving disputes regarding SD's obligation to reimburse the United States and the State for their Reimbursable Future Response Costs and Reimbursable State Future Response Costs.

29.     **Interest**. In the event that any payment for Reimbursable Future Response Costs required under this Section is not made by the date required, SD shall pay Interest on the unpaid balance. The Interest on Future Response Costs shall begin to accrue on the date of receipt of the bill. The Interest shall accrue through the date of SD's payment. Payments of Interest made under this Paragraph shall be in addition to such other remedies or sanctions available to Plaintiffs by virtue of SD's failure to make timely payments under this Section including, but not

limited to, payment of stipulated penalties pursuant to ¶ 47 (Stipulated Penalty Amounts – Work).

30.     **Payments by SFAs**.

a.      **Payment to SD**. As soon as reasonably practicable after the Effective Date, the United States, on behalf of SFAs, shall pay to SD $2,000,000 by Automated Clearing House (ACH) Electronic Funds Transfer in accordance with instructions provided by SD.

b.      **Interest**. In the event that any payment required by ¶ 30.a is not made within 120 days after the Effective Date, the United States, on behalf of SFAs, shall pay Interest on the unpaid balance, with such Interest commencing on the 121st day after the Effective Date and accruing through the date of the payment.

c.      The Parties to this CD recognize and acknowledge that the payment obligations of the SFAs under this CD can only be paid from appropriated funds legally available for such purpose. Nothing in this CD shall be interpreted or construed as a commitment or requirement that any Settling Federal Agency obligate or pay funds in contravention of the Anti-Deficiency Act, 31 U.S.C. § 1341, or any other applicable provision of law.

## XI.     INDEMNIFICATION AND INSURANCE

31.     **SD's Indemnification of the United States and the State**.

a.      The United States and the State do not assume any liability by entering into this CD or by virtue of any designation of SD as EPA's authorized representatives under Section 104(e) of CERCLA, 42 U.S.C. § 9604(e). SD shall indemnify, save, and hold harmless the United States and the State and their officials, agents, employees, contractors, subcontractors, and representatives for or from any and all claims or causes of action arising from, or on account of, negligent or other wrongful acts or omissions of SD, its officers, directors, employees, agents, contractors, subcontractors, and any persons acting on SD's behalf or under its control, in carrying out activities pursuant to this CD, including, but not limited to, any claims arising from any designation of SD as EPA's authorized representatives under Section 104(e) of CERCLA. Further, SD agrees to pay the United States and the State all costs they incur including, but not limited to, attorneys' fees and other expenses of litigation and settlement arising from, or on account of, claims made against the United States and the State based on negligent or other wrongful acts or omissions of SD, its officers, directors, employees, agents, contractors, subcontractors, and any persons acting on its  behalf or under its control, in carrying out activities pursuant to this CD. Neither the United States nor the State shall be held out as a party to any contract entered into by or on behalf of SD in carrying out activities pursuant to this CD. Neither SD nor any such contractor shall be considered an agent of the United States or the State.

b.      The United States and the State, respectively, shall give SD notice of any claim for which the United States or the State plans to seek indemnification pursuant to this ¶ 31, and shall consult with SD prior to settling such claim.

32.     SD covenants not to sue and agrees not to assert any claims or causes of action against the United States and the State, respectively, for damages or reimbursement or for set-off of any payments made or to be made to the United States or the State, arising from or on account

of any contract, agreement, or arrangement between SD and any person for performance of Work on or relating to the Site, including, but not limited to, claims on account of construction delays. In addition, SD shall indemnify, save and hold harmless the United States and the State with respect to any and all claims for damages or reimbursement arising from or on account of any contract, agreement, or arrangement between SD and any person for performance of Work on or relating to the Site, including, but not limited to, claims on account of construction delays.

33.     **Insurance**. No later than 15 days before commencing any on-site Work, SD shall secure, and shall maintain until the first anniversary after the RA has been performed in accordance with this CD and the Performance Standards have been achieved, commercial general liability insurance with limits of $3 million, for any one occurrence, and automobile liability insurance with limits of $1 million, combined single limit, naming the United States and the State as additional insureds with respect to all liability arising out of the activities performed by or on behalf of SD pursuant to this CD. In addition, for the duration of this CD, SD shall satisfy, or shall ensure that its contractors or subcontractors satisfy, all applicable laws and regulations regarding the provision of worker's compensation insurance for all persons performing the Work on behalf of SD in furtherance of this CD. Prior to commencement of the Work, SD shall provide to EPA and the State certificates of such insurance and a copy of each insurance policy. SD shall resubmit such certificates and copies of policies each year on the anniversary of the Effective Date. If SD demonstrates by evidence satisfactory to EPA and the State that any contractor or subcontractor maintains insurance equivalent to that described above, or insurance covering the same risks but in a lesser amount, then, with respect to that contractor or subcontractor, SD need provide only that portion of the insurance described above that is not maintained by the contractor or subcontractor.

## XII.   CLAIMS AGAINST THE SUPERFUND

34.     **Reimbursement of Claims**

a.      Pursuant to Sections 111(a)(2), 112, and 122(b)(1) of CERCLA, 42 U.S.C. §§ 9611(a)(2), 9612, and 9622(b)(1), SD may submit a claim for reimbursement to the Hazardous Substance Superfund (the Fund) for up to 40% of the necessary costs incurred in completing the Work in accordance with this Consent Decree, the ROD, the SOW and Appendix E (Preauthorization Decision Document).  In no event shall SD's total claim(s) against the Fund under this Section exceed the sum of $31,560,000.  Reimbursement from the Fund shall be subject to the provisions of Section 112 of CERCLA, the regulations set forth in 40 C.F.R. Part 307, and the applicable claims and audits procedures specified in the Preauthorization Decision Document, attached hereto as Appendix E, and shall be made in accordance with the procedures outlined in therein.

b.      As provided in the Preauthorization Decision Document (Attached as Appendix E), EPA shall make eligible for reimbursement $5.26 million to the SD after the Effective Date.

c.      Beginning on the second anniversary of the Effective Date, and every two years thereafter until the cumulative amount requested to be eligible for reimbursement is $31,560,000, SD may submit for approval an amendment to the Preauthorization Decision Document increasing the amount eligible for reimbursement by an additional $5.26 million each

time SD submits such an amendment.  Notwithstanding anything else in this paragraph, SD shall submit such amendments whenever the projected reimbursement claims against the Fund for the succeeding six months exceed the amount eligible for reimbursement set forth in the Preauthorization Decision Document (as amended by any previously approved amendments). SD's failure timely to submit an amendment application shall not alter any of its obligations under this CD in any way.  At no time may the cumulative amount requested for reimbursement exceed $31,560,000.  EPA shall not be obligated to make available for reimbursement to SD more than the amount specified in Appendix E unless and until an amended Preauthorization Decision Document is issued by EPA.

        d.        If SD timely submits a complete Preauthorization Decision Document amendment application, and EPA does not approve it before SD's reimbursement claims exhaust the amount eligible for reimbursement set forth in the Preauthorization Decision Document (as amended by any previous approved amendments), SD shall not be required to complete more than 60% of the Work otherwise scheduled until such time as EPA approves the amendment with a reimbursement rate adjusted to provide for overall reimbursement at the previously approved rate.

        e.        SD's claim(s) against the Fund may cover only those costs incurred in implementing the Work, including costs for SD personnel and equipment only to the extent that such costs are directly necessary for the implementation of the Work, and may include attorney's fees only to the extent that such fees are directly necessary for the implementation of the Work (e.g. attorneys' fees for drawing necessary contract documents), and otherwise meet the requirements of 40 C.F.R. Part 307.  SD shall be solely responsible for any other type of attorneys' fees (e.g., fees related to evaluating or establishing the liability of SD or any person, pursuing a claim against any other person, defending a claim by the United States or any other person, evaluating SD's submissions under, or compliance with, the terms of this Consent Decree, or advising or representing SD in any action or dispute resolution under this Consent Decree or in any action or proceeding to enforce this Consent Decree) and all Operation and Maintenance costs incurred after the issuance by EPA of the Certification of RA Completion, and may not submit a claim against the Fund for these costs.

        f.        If EPA denies a claim for reimbursement in whole or in part, it shall notify SD in writing of the reason for such denial.  Within thirty (30) days after receiving such written notice of EPA's decision, SD may request an administrative hearing as provided in Section 112(b)(2) of CERCLA, 42 U.S.C. § 9612(b)(2), and 40 C.F.R. Part 307.

        g.        EPA shall deposit any funds paid on account of a claim for reimbursement into the financial assurance trust set forth in Paragraph 19 until EPA approves a reduction in the amount of financial assurance in accordance with Paragraph 22.b.  After the first such reduction, EPA shall make all payments on account of a claim for reimbursement directly to SD.

        h.        Pursuant to Section 112(c)(1) of CERCLA, 42 U.S.C. § 9612(c)(1), SD hereby subrogates its rights to the United States to recover from other parties, who are not signatories of this Consent Decree, any costs reimbursed to SD under this Section, and SD and its contractors shall assist in any action to recover these costs that may be initiated by the United States.   All of SD's contracts for implementing the Preauthorization Decision Document shall

include a specific requirement that the contractors agree to provide this cost recovery assistance to the United States.  The cost recovery assistance shall include, but not be limited to, furnishing the personnel, services, documents, and materials requested by the United States to assist the United States in documenting the work performed and costs expended by SD or SD's contractors at the Site in order to aid in cost recovery efforts.  Assistance shall also include providing all requested assistance in the interpretation of evidence and costs, and providing requested testimony.

## XIII.  FORCE MAJEURE

35.　　"Force majeure," for purposes of this CD, is defined as any event arising from causes beyond the control of SD, of any entity controlled by SD, or of SD's contractors that delays or prevents the performance of any obligation under this CD despite SD's best efforts to fulfill the obligation. The requirement that SD exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential force majeure and best efforts to address the effects of any potential force majeure (a) as it is occurring and (b) following the potential force majeure such that the delay and any adverse effects of the delay are minimized to the greatest extent possible. "Force majeure" does not include financial inability to complete the Work or a failure to achieve the Performance Standards.

36.　　If any event occurs or has occurred that may delay the performance of any obligation under this CD for which SD intends or may intend to assert a claim of force majeure, SD shall notify EPA's Project Coordinator orally or, in his or her absence, EPA's Alternate Project Coordinator or, in the event both of EPA's designated representatives are unavailable, the Director of the Superfund Division, EPA Region 7, within 10 days of when SD first knew that the event might cause a delay. Within 10 days thereafter, SD shall provide in writing to EPA and the State an explanation and description of the reasons for the delay; the anticipated duration of the delay; all actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; SD's rationale for attributing such delay to a force majeure; and a statement as to whether, in the opinion of SD, such event may cause or contribute to an endangerment to public health or welfare, or the environment. SD shall include with any notice all available documentation supporting its claim that the delay was attributable to a force majeure. SD shall be deemed to know of any circumstance of which SD, any entity controlled by SD, or SD's contractors or subcontractors knew or should have known. Failure to comply with the above requirements regarding an event shall preclude SD from asserting any claim of force majeure regarding that event, provided, however, that if EPA, despite the late or incomplete notice, is able to assess to its satisfaction whether the event is a force majeure under ¶ 35 and whether SD has exercised its best efforts under ¶ 35, EPA may, in its unreviewable discretion, excuse in writing SD's failure to submit timely or complete notices under this Paragraph.

37.　　If EPA, after a reasonable opportunity for review and comment by the State, agrees that the delay or anticipated delay is attributable to a force majeure, the time for performance of the obligations under this CD that are affected by the force majeure will be extended by EPA, after a reasonable opportunity for review and comment by the State, for such time as is necessary to complete those obligations. An extension of the time for performance of the obligations affected by the force majeure shall not, of itself, extend the time for performance

23

of any other obligation. If EPA, after a reasonable opportunity for review and comment by the State, does not agree that the delay or anticipated delay has been or will be caused by a force majeure, EPA will notify SD in writing of its decision. If EPA, after a reasonable opportunity for review and comment by the State, agrees that the delay is attributable to a force majeure, EPA will notify SD in writing of the length of the extension, if any, for performance of the obligations affected by the force majeure.

38.     If SD elects to invoke the dispute resolution procedures set forth in Section XIV (Dispute Resolution) regarding EPA's decision, it shall do so no later than 30 days after receipt of EPA's notice. In any such proceeding, SD shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a force majeure, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and that SD complied with the requirements of ¶¶ 35 and 36. If SD carries this burden, the delay at issue shall be deemed not to be a violation by SD of the affected obligation of this CD identified to EPA and the Court.

39.     The failure by EPA to timely complete any obligation under the CD or under the SOW is not a violation of the CD, provided, however, that if such failure prevents SD from meeting one or more deadlines in the SOW, SD may seek relief under this Section.

## XIV.  DISPUTE RESOLUTION

40.     Unless otherwise expressly provided for in this CD, the dispute resolution procedures of this Section shall be the exclusive mechanism to resolve disputes regarding this CD. However, the procedures set forth in this Section shall not apply to actions by the United States to enforce obligations of SD that have not been disputed in accordance with this Section.

41.     A dispute shall be considered to have arisen when one party sends the other parties a written Notice of Dispute. Any dispute regarding this CD shall in the first instance be the subject of informal negotiations between the parties to the dispute. The period for informal negotiations shall not exceed 30 days from the time the dispute arises, unless it is modified by written agreement of the parties to the dispute.

42.     **Statements of Position**.

a.      In the event that the parties cannot resolve a dispute by informal negotiations under the preceding Paragraph, then the position advanced by EPA shall be considered binding unless, within 30 days after the conclusion of the informal negotiation period, SD invokes the formal dispute resolution procedures of this Section by serving on the United States and the State a written Statement of Position on the matter in dispute, including, but not limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation relied upon by SD. The Statement of Position shall specify SD's position as to whether formal dispute resolution should proceed under ¶ 43 (Record Review) or 44.

b.      Within 30 days after receipt of SD's Statement of Position, EPA will serve on SD its Statement of Position, including, but not limited to, any factual data, analysis, or opinion supporting that position and all supporting documentation relied upon by EPA. EPA's

Statement of Position shall include a statement as to whether formal dispute resolution should proceed under ¶ 43 (Record Review) or 44. Within 30 days after receipt of EPA's Statement of Position, SD may submit a Reply.

      c.      If there is disagreement between EPA and SD as to whether dispute resolution should proceed under ¶ 43 (Record Review) or 44, the parties to the dispute shall follow the procedures set forth in the Paragraph determined by EPA to be applicable. However, if SD ultimately appeals to the Court to resolve the dispute, the Court shall determine which Paragraph is applicable in accordance with the standards of applicability set forth in ¶¶ 43 and 44.

      43.      **Record Review**. Formal dispute resolution for disputes pertaining to the selection or adequacy of any response action and all other disputes that are accorded review on the administrative record under applicable principles of administrative law shall be conducted pursuant to the procedures set forth in this Paragraph. For purposes of this Paragraph, the adequacy of any response action includes, without limitation, the adequacy or appropriateness of plans, procedures to implement plans, or any other items requiring approval by EPA under this CD, and the adequacy of the performance of response actions taken pursuant to this CD. Nothing in this CD shall be construed to allow any dispute by SD regarding the validity of the ROD's provisions.

      a.      An administrative record of the dispute shall be maintained by EPA and shall contain all statements of position, including supporting documentation, submitted pursuant to this Section. Where appropriate, EPA may allow submission of supplemental statements of position by the parties to the dispute.

      b.      The Director of the Superfund Division, EPA Region 7, will issue a final administrative decision resolving the dispute based on the administrative record described in ¶ 43.a. This decision shall be binding upon SD, subject only to the right to seek judicial review pursuant to ¶¶ 43.c and 43.d.

      c.      Any administrative decision made by EPA pursuant to ¶ 43.b shall be reviewable by this Court, provided that a motion for judicial review of the decision is filed by SD with the Court and served on all Parties within 20 days after receipt of EPA's decision. The motion shall include a description of the matter in dispute, the efforts made by the parties to resolve it, the relief requested, and the schedule, if any, within which the dispute must be resolved to ensure orderly implementation of this CD. The United States may file a response to SD's motion.

      d.      In proceedings on any dispute governed by this Paragraph, SD shall have the burden of demonstrating that the decision of the Superfund Division Director is arbitrary and capricious or otherwise not in accordance with law. Judicial review of EPA's decision shall be on the administrative record compiled pursuant to ¶ 43.a.

44.     Formal dispute resolution for disputes that neither pertain to the selection or adequacy of any response action nor are otherwise accorded review on the administrative record under applicable principles of administrative law, shall be governed by this Paragraph.

a.     The Director of the Superfund Division, EPA Region 7, will issue a final decision resolving the dispute based on the statements of position and reply, if any, served under ¶ 42. The Superfund Division Director's decision shall be binding on SD unless, within 20 days after receipt of the decision, SD files with the Court and serves on the parties a motion for judicial review of the decision setting forth the matter in dispute, the efforts made by the parties to resolve it, the relief requested, and the schedule, if any, within which the dispute must be resolved to ensure orderly implementation of the CD. The United States may file a response to SD's motion.

b.     Notwithstanding ¶ M (CERCLA § 113(j) record review of ROD and Work) of Section I (Background), judicial review of any dispute governed by this Paragraph shall be governed by applicable principles of law.

45.     The invocation of formal dispute resolution procedures under this Section does not extend, postpone, or affect in any way any obligation of SD under this CD, except as provided in ¶ 28 (Contesting Future Response Costs), as agreed by EPA, or as determined by the Court. Stipulated penalties with respect to the disputed matter shall continue to accrue, but payment shall be stayed pending resolution of the dispute, as provided in ¶ 53. Notwithstanding the stay of payment, stipulated penalties shall accrue from the first day of noncompliance with any applicable provision of this CD. In the event that SD does not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section XV (Stipulated Penalties).

## XV.   STIPULATED PENALTIES

46.     SD shall be liable for stipulated penalties in the amounts set forth in ¶¶ 47, 48 and 49, to the United States and the State, with each Plaintiff receiving fifty percent of the payment, for failure to comply with the requirements of this CD specified below, unless excused under Section XII (Force Majeure). "Compliance" by SD shall include completion of all activities and obligations, including payments, required under this CD, or any deliverable approved under this CD, in accordance with all applicable requirements of law, this CD, the SOW, and any deliverables approved under this CD and within the specified time schedules established by and approved under this CD.

**47.     Stipulated Penalty Amounts - Work (Including Payments and Excluding Deliverables).**

a.     The following stipulated penalties shall accrue per violation per day for any noncompliance identified in ¶ 47.b:

| Period of Noncompliance | Penalty Per Violation Per Day |
|---|---|
| 1st through 14th day | $1,000 |
| 15th through 30th day | $2,000 |
| 31st day and beyond | $3,000 |

b.     Compliance Milestones.

(1)     Completion of Work as set forth in the SOW and in work plans required by the SOW, including timely completion of milestones set forth in Section 7 of the SOW.

(2)     Completion of Hayden Creek Mining Area response action as set forth in Hayden Creek Mining Area Work Plan and in any work plans required thereby.

(3)     Notification to EPA of SD's inability to obtain access pursuant to Paragraph 17 within thirty days of the property owner's final refusal to provide access.

48.     **Stipulated Penalty Amounts – Financial Assurance**

a.     The following stipulated penalties shall accrue per violation per day for any noncompliance identified in ¶ 48.b:

| Period of Noncompliance | Penalty Per Violation Per Day |
|---|---|
| 1st through 14th day | $500 |
| 15th through 30th day | $1,000 |
| 31st day and beyond | $1,500 |

b.     Establishment and maintenance of financial assurance in compliance with the timelines and other substantive and procedural requirements of Section IX (Financial Assurance) and Appendix D.

49.     **Stipulated Penalty Amounts - Deliverables**.

a.     **Material Defects**. If an initially submitted or resubmitted deliverable contains a material defect, and the deliverable is disapproved or modified by EPA under ¶ 6.6(a) (Initial Submissions) or 6.6(b) (Resubmissions) of the SOW due to such material defect, then the material defect shall constitute a lack of compliance for purposes of ¶ 46. The provisions of Section XIV (Dispute Resolution) and Section XV (Stipulated Penalties) shall govern the accrual and payment of any stipulated penalties regarding SD's submissions under this CD.

b.     The following stipulated penalties shall accrue per violation per day for failure to submit timely or adequate deliverables pursuant to the CD:

| Period of Noncompliance | Penalty Per Violation Per Day |
|---|---|
| 1st through 14th day | $500 |
| 15th through 30th day | $1,500 |
| 31st day and beyond | $2,500 |

50.     In the event that EPA assumes performance of a portion or all of the Work pursuant to ¶ 63 (Work Takeover), SD shall be liable for a stipulated penalty in the amount of $3,000,000. Stipulated penalties under this Paragraph are in addition to the remedies available under ¶¶ 21 (Access to Financial Assurance) and 63 (Work Takeover).

51.     All penalties shall begin to accrue on the day after the complete performance is due or the day a violation occurs and shall continue to accrue through the final day of the correction of the noncompliance or completion of the activity. However, stipulated penalties shall not accrue: (a) with respect to a deficient submission under ¶ 6.6 (Approval of Deliverables) of the SOW, during the period, if any, beginning on the 31st day after EPA's receipt of such submission until the date that EPA notifies SD of any deficiency; (b) with respect to a decision by the Director of the Superfund  Division, EPA Region 7, under ¶ 43.b or 44.a of Section XIV (Dispute Resolution), during the period, if any, beginning on the 21st day after the date that SD's reply to EPA's Statement of Position is received until the date that the Director issues a final decision regarding such dispute; or (c) with respect to judicial review by this Court of any dispute under Section XIV (Dispute Resolution), during the period, if any, beginning on the 31st day after the Court's receipt of the final submission regarding the dispute until the date that the Court issues a final decision regarding such dispute. Nothing in this CD shall prevent the simultaneous accrual of separate penalties for separate violations of this CD.

52.     Following EPA's determination that SD has failed to comply with a requirement of this CD, EPA may give SD written notification of the same and describe the noncompliance. EPA and the State may send SD a written demand for payment of the penalties. However, penalties shall accrue as provided in the preceding Paragraph regardless of whether EPA has notified SD of a violation.

a.      All penalties accruing under this Section shall be due and payable, fifty percent to the United States and fifty percent to the State, within 30 days after SD's receipt from EPA of a demand for payment of the penalties, unless SD invokes the Dispute Resolution procedures under Section XIV (Dispute Resolution) within the 30-day period. All payments to the United States under this Section shall indicate that the payment is for stipulated penalties and shall be made in accordance with ¶ 27.a (instructions for future response cost payments) and 27.c.

53.     Penalties shall continue to accrue as provided in ¶ 51 during any dispute resolution period, but need not be paid until the following:

a.      If the dispute is resolved by agreement of the parties or by a decision of EPA that is not appealed to this Court, accrued penalties determined to be owed shall be paid to EPA and the State within 15 days after the agreement or the receipt of EPA's decision or order;

b.      If the dispute is appealed to this Court and the United States prevails in whole or in part, SD shall pay all accrued penalties determined by the Court to be owed to EPA and the State within 60 days after receipt of the Court's decision or order, except as provided in ¶ 53.c;

c.      If the District Court's decision is appealed by any Party, SD shall pay all accrued penalties determined by the District Court to be owed to the United States and the State

into an interest-bearing escrow account, established at a duly chartered bank or trust company that is insured by the FDIC, within 60 days after receipt of the Court's decision or order. Penalties shall be paid into this account as they continue to accrue, at least every 60 days. Within 15 days after receipt of the final appellate court decision, the escrow agent shall pay the balance of the account to EPA and the State or to SD to the extent that they prevail.

54. If SD fails to pay stipulated penalties when due, SD shall pay Interest on the unpaid stipulated penalties as follows: (a) if SD has timely invoked dispute resolution such that the obligation to pay stipulated penalties has been stayed pending the outcome of dispute resolution, Interest shall accrue from the date stipulated penalties are due pursuant to ¶ 53 until the date of payment; and (b) if SD fails to timely invoke dispute resolution, Interest shall accrue from the date of demand under ¶ 52.a until the date of payment. If SD fails to pay stipulated penalties and Interest when due, the United States or the State may institute proceedings to collect the penalties and Interest.

55. The payment of penalties and Interest, if any, shall not alter in any way SD's obligation to complete the performance of the Work required under this CD.

56. Nothing in this CD shall be construed as prohibiting, altering, or in any way limiting the ability of the United States or the State to seek any other remedies or sanctions available by virtue of SD's violation of this CD or of the statutes and regulations upon which it is based, including, but not limited to, penalties pursuant to Section 122(*l*) of CERCLA, 42 U.S.C. § 9622(*l*), provided, however, that the United States shall not seek civil penalties pursuant to Section 122(*l*) of CERCLA for any violation for which a stipulated penalty is provided in this CD, except in the case of a willful violation of this CD.

57. Notwithstanding any other provision of this Section, the United States may, in its unreviewable discretion, waive any portion of stipulated penalties that have accrued pursuant to this CD.

## XVI.   COVENANTS BY PLAINTIFFS

58. **Covenants for SD by United States**. Except as provided in ¶ 62 (General Reservations of Rights), the United States covenants not to sue or to take administrative action against SD pursuant to Sections 106 and 107(a) of CERCLA for Operable Unit 01, the Work, the 2016 UAO Work, Past Response Costs, and Future Response Costs, SD's Past Response Costs, and SD's Future Response Costs. These covenants shall take effect upon the Effective Date. These covenants are conditioned upon the satisfactory performance by SD of its obligations under this CD. These covenants extend only to SD and do not extend to any other person.

59. **Covenant for SFAs by United States**. Except as provided in ¶ 62 (General Reservations of Rights), EPA covenants not to take administrative action against SFAs pursuant to Sections 106 and 107(a) of CERCLA for Operable Unit 01, the Work, the 2016 UAO Work, Past Response Costs, Future Response Costs. EPA's covenant shall take effect upon the Effective Date. EPA's covenant is conditioned upon the satisfactory performance by SFAs of

29

their obligations under this CD. EPA's covenant extends only to SFAs and does not extend to any other person.

60.     **Covenant for SD by the State.** Except as provided in ¶ 62 (General Reservation of Rights), the State covenants not to sue or take administrative action against SD pursuant to Section 107(a) of CERCLA for Operable Unit 1, the Work, the 2016 UAO Work, State Past Response Costs, and State Future Response Costs, SDs' Past Response Costs, and SDs' Future Response Costs. The State additionally covenants not to sue or take administrative action against SD for damages for injury to, destruction of, or loss of natural resources at OU-1. The State additionally covenants not to sue or take administrative action against SD for primary restoration of terrestrial natural resources at the Site; provided that at the time the Leadwood pile is no longer used as a repository, SD shall establish and maintain an appropriate mix of native plant species (selected by SD from the list in Appendix I) on the areas of the Leadwood Soil Repository used for placement of soils that will be vegetated as part of the Repository closure pursuant to the approved Repository Operation Plan.  This covenant does not extend to claims for interim loss of natural resources or to any natural-resource damage claims for the Big River, its tributaries, floodplains, other streams within the Site, and assessment costs related thereto. The covenants set forth in this ¶ 60 shall take effect upon the Effective Date.

61.     **Covenant for SFAs by State.** Except as provided in ¶ 62 (General Reservations of Rights), the State covenants not to sue, not to take administrative action against, and not to assert any claims or causes of action against SFAs with respect to Operable Unit 01, the Work, the 2016 UAO Work, State Past Response Costs, State Future Response Costs, and this CD, including, but not limited to, any claims under CERCLA §§ 107 or 113, RCRA Section 7002(a), 42 U.S.C. § 6972(a), or state law.  The State additionally covenants not to sue or take administrative action against SFAs for damages for injury to, destruction of, or loss of natural resources at Operable Unit 1.  The State additionally covenants not to sue or take administrative action against SFAs for primary restoration of terrestrial natural resources at the Site.  This covenant does not extend to claims for interim loss of natural resources or to any natural-resource damage claims for the Big River, its tributaries, floodplains, other streams within the Site, and assessment costs related thereto.  These covenants shall take effect upon the Effective Date.  These covenants are conditioned upon the satisfactory performance by SFAs of their obligations under this CD.  These covenants extend only to SFAs and do not extend to any other person.

62.     **General Reservations of Rights**. The United States and the State reserve, and this CD is without prejudice to, all rights against SD, and EPA and the State reserve, and this CD is without prejudice to, all rights against SFAs, with respect to all matters not expressly included within Plaintiffs' covenants. Notwithstanding any other provision of this CD, the United States and the State reserve all rights against SD, and EPA and the State reserve, and this CD is without prejudice to, all rights against SFAs, with respect to:

      a.     liability for failure by SD or SFAs to meet a requirement of this CD;

      b.     liability arising from the past, present, or future disposal, release, or threat of release of Waste Material outside of the Site;

30

c.      liability based on the ownership of the Site by SD or SFAs when such ownership commences after signature of this CD by SD or SFAs;

d.       liability based on the operation of the Site by SD when such operation commences after signature of this CD by SD and does not arise solely from SD's performance of the Work and liability based on the operation of the Site by SFAs when such operation commences after signature of this CD by SFAs;

e.      liability based on SD's or SFAs' transportation, treatment, storage, or disposal, or arrangement for transportation, treatment, storage, or disposal of Waste Material at or in connection with the Site, other than as provided in the ROD, the Work, or otherwise ordered by EPA, after signature of this CD by SD or SFAs;

f.      liability for damages for injury to, destruction of, or loss of natural resources, and for the costs of any natural resource damage assessments (except, as to the State, as provided in ¶ 60 (Covenant for SD by the State) and ¶ 61 (Covenant for SFAs by State));

g.      criminal liability;

h.      liability for violations of federal or state law that occur during or after implementation of the Work;

i.      liability, prior to achievement of Performance Standards, for additional response actions that EPA determines are necessary to achieve and maintain Performance Standards or to carry out and maintain the effectiveness of the remedy set forth in the ROD, but that cannot be required pursuant to ¶ 13 (Modification of SOW or Related Deliverables);

j.       liability for additional operable units at the Site or the final response action;

k.      liability for costs that the United States or the State will incur regarding the Site but that are not within the definition of Future Response Costs or State Future Response Costs; and,

l.       previously incurred costs of response that are not within the definition of Past Response Costs or State Past Response Costs.

63.      **Work Takeover**.

a.      In the event EPA determines that SD: (1) has ceased implementation of any portion of the Work; (2) is seriously or repeatedly deficient or late in its performance of the Work; or (3) is implementing the Work in a manner that may cause an endangerment to human health or the environment, EPA may issue a written notice ("Work Takeover Notice") to SD. Any Work Takeover Notice issued by EPA will specify the grounds upon which such notice was issued and will provide SD a period of 10 days within which to remedy the circumstances giving rise to EPA's issuance of such notice.

b.      If, after expiration of the 10-day notice period specified in ¶ 63.a, SD has not remedied to EPA's satisfaction the circumstances giving rise to EPA's issuance of the relevant Work Takeover Notice, EPA may at any time thereafter assume the performance of all

31

or any portion(s) of the Work as EPA deems necessary ("Work Takeover"). EPA will notify SD in writing (which writing may be electronic) if EPA determines that implementation of a Work Takeover is warranted under this ¶ 63.b. Funding of Work Takeover costs is addressed under ¶ 21 (Access to Financial Assurance).

      c.      SD may invoke the procedures set forth in ¶ 43 (Record Review), to dispute EPA's implementation of a Work Takeover under ¶ 63.b. However, notwithstanding SD's invocation of such dispute resolution procedures, and during the pendency of any such dispute, EPA may in its sole discretion commence and continue a Work Takeover under ¶ 63.b until the earlier of (1) the date that SD remedies, to EPA's satisfaction, the circumstances giving rise to EPA's issuance of the relevant Work Takeover Notice, or (2) the date that a final decision is rendered in accordance with ¶ 43 (Record Review) requiring EPA to terminate such Work Takeover.

      64.      Notwithstanding any other provision of this CD, the United States and the State retain all authority and reserve all rights to take any and all response actions authorized by law.

## XVII. COVENANTS BY SD AND SFAs

      65.      **Covenants by SD**. Subject to the reservations in ¶ 68, SD covenants not to sue and agrees not to assert any claims or causes of action against the United States or the State with respect to Operable Unit 01, the Work, the 2016 UAO Work, Past Response Costs, Future Response Costs, State Past Response Costs, State Future Response Costs, SD's Past Response Costs, SD's Future Response Costs, and this CD, including, but not limited to:

      a.      Except as set forth in Section XII (Claims Against the Fund), any direct or indirect claim for reimbursement from the EPA Hazardous Substance Superfund through CERCLA §§ 106(b)(2), 107, 111, 112 or 113, or any other provision of law;

      b.      any claims under CERCLA §§ 107 or 113, RCRA Section 7002(a), 42 U.S.C. § 6972(a), or state law regarding Operable Unit 01, the Work, the 2016 UAO Work, Past Response Costs, Future Response Costs, State Past Response Costs, State Future Response Costs, SD's Past Response Costs, SD's Future Response Costs, and this CD; or

      c.      any claims arising out of response actions at or in connection with Operable Unit 01 of the Site, including any claim under the United States Constitution, the Constitution of the State of Missouri, the Tucker Act, 28 U.S.C. § 1491, the Equal Access to Justice Act, 28 U.S.C. § 2412, or at common law.

      SD additionally covenants not to sue and agrees not to assert any claims or causes of action against the SFAs with respect to the revegetation of the Leadwood Soil Repository set forth in ¶ 60.

      66.      **Covenant by SFAs**. SFAs agree not to assert any direct or indirect claim for reimbursement from the EPA Hazardous Substance Superfund through CERCLA §§ 106(b)(2), 107, 111, 112, or 113, or any other provision of law, or to assert any claim against the State under CERCLA §§ 107 or 113, with respect to Operable Unit 01, the Work, the 2016 UAO Work, Past Response Costs, Future Response Costs, SD's Past Response Costs, SD's Future Response Costs, and this CD. This covenant does not preclude demand for reimbursement from

the Superfund of costs incurred by a SFA in the performance of its duties (other than pursuant to this CD) as lead or support agency under the NCP.

67.     Except as provided in ¶¶ 70 (Waiver of Claims by SD) and 77 (Res Judicata and Other Defenses), the covenants in this Section shall not apply if the United States or the State brings a cause of action or issues an order pursuant to any of the reservations in Section XVI (Covenants by Plaintiffs), other than in ¶¶ 62.a (claims for failure to meet a requirement of the CD), 62.g (criminal liability), and 62.h (violations of federal/state law during or after implementation of the Work), but only to the extent that SD's or the SFAs' claims arise from the same response action, response costs, or damages that the United States or the State is seeking pursuant to the applicable reservation.

68.     SD reserves, and this CD is without prejudice to, claims against the United States, subject to the provisions of Chapter 171 of Title 28 of the United States Code, and brought pursuant to any statute other than CERCLA or RCRA and for which the waiver of sovereign immunity is found in a statute other than CERCLA or RCRA, for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the United States, as that term is defined in 28 U.S.C. § 2671, while acting within the scope of his or her office or employment under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred. However, the foregoing shall not include any claim based on EPA's selection of response actions, or the oversight or approval of SD's deliverables or activities. SD also reserves, and this CD is without prejudice to, contribution claims against SFAs in the event any claim is asserted by the United States or the State against SD pursuant to any of the reservations in Section XVI (Covenants by Plaintiffs) other than in ¶¶ 62.a (claims for failure to meet a requirement of the CD), 62.g (criminal liability), and 62.h (violations of federal/state law during or after implementation of the Work), but only to the extent that SD's claims arise from the same response action, response costs, or damages that the United States or the State is seeking pursuant to the applicable reservation.

69.     Except as set forth in Section XII (Claims Against the Fund), nothing in this CD shall be deemed to constitute approval or preauthorization of a claim within the meaning of Section 111 of CERCLA, 42 U.S.C. § 9611, or 40 C.F.R. § 300.700(d).

70.     **Waiver of Claims by SD**.

a.      SD agrees not to assert any claims and to waive all claims or causes of action (including but not limited to claims or causes of action under Sections 107(a) and 113 of CERCLA) that they may have with respect to the following:

(1)     **De Micromis Waiver**. For all matters relating to the Site against any person where the person's liability to SD with respect to the Site is based solely on having arranged for disposal or treatment, or for transport for disposal or treatment, of hazardous substances at the Site, or having accepted for transport for disposal or treatment of hazardous substances at the Site, if all or part of the disposal, treatment, or transport occurred before April 1, 2001, and the total amount of material containing hazardous substances contributed by such person to the Site was less than 110 gallons of liquid materials or 200 pounds of solid materials;

33

(2)      **Specific Persons Doe Run Contends Are Potentially Responsible Parties.**  For all matters relating to OU-1 against any other person, except any person to whom SD presents a claim pursuant to 40 C.F.R. § 307.30.  SD shall present any such claim at least 60 days prior to SD submitting its first claim for reimbursement pursuant to Paragraph 34 (Reimbursement of Claims) and Appendix E (Preauthorization Decision Document), with a simultaneous copy to the United States and State.

71.     SD agrees not to seek judicial review of the final rule listing the Site on the NPL based on a claim that changed site conditions that resulted from the performance of the Work in any way affected the basis for listing the Site.

## XVIII.      EFFECT OF SETTLEMENT; CONTRIBUTION

72.     Except as provided in ¶ 70 (Waiver of Claims by SD), nothing in this CD shall be construed to create any rights in, or grant any cause of action to, any person not a Party to this CD. Except as provided in Section XVII (Covenants by SD and SFAs), each of the Parties expressly reserves any and all rights (including, but not limited to, pursuant to Section 113 of CERCLA, 42 U.S.C. § 9613), defenses, claims, demands, and causes of action that each Party may have with respect to any matter, transaction, or occurrence relating in any way to the Site against any person not a Party hereto. Nothing in this CD diminishes the right of the United States, pursuant to Section 113(f)(2) and (3) of CERCLA, 42 U.S.C. § 9613(f)(2)-(3), to pursue any such persons to obtain additional response costs or response action and to enter into settlements that give rise to contribution protection pursuant to Section 113(f)(2).

73.     The Parties agree, and by entering this CD this Court finds, that this CD constitutes a judicially-approved settlement pursuant to which SD and each SFA has, as of the Effective Date, resolved liability to the United States and the State within the meaning of Section 113(f)(2) of CERCLA, 42 U.S.C. § 9613(f)(2), and is entitled, as of the Effective Date, to protection from contribution actions or claims as provided by Section 113(f)(2) of CERCLA, or as may be otherwise provided by law, for the "matters addressed" in this CD.  The "matters addressed" in this CD are Operable Unit 01, the Work, the 2016 UAO Work, Past Response Costs, Future Response Costs, State Past Response Costs, State Future Response Costs, SD's Past Response Costs, SD's Future Response Costs.

74.     The Parties further agree, and by entering this CD this Court finds, that the complaint filed by the Plaintiffs in this action is a civil action within the meaning of Section 113(f)(1) of CERCLA, 42 U.S.C. § 9613(f)(1), and that this CD constitutes a judicially-approved settlement pursuant to which Settling Defendant and each SFA has, as of the Effective Date, resolved liability to the United States and the State within the meaning of Section 113(f)(3)(B) of CERCLA, 42 U.S.C. § 9613(f)(3)(B).

75.     SD shall, with respect to any suit or claim brought by it for matters related to this CD, except for a demand required by 40 C.F.R. § 307.30, notify the United States and the State in writing no later than 60 days prior to the initiation of such suit or claim.

76.     SD shall, with respect to any suit or claim brought against it for matters related to this CD, notify in writing the United States and the State within 10 days after service of the

complaint on SD. In addition, SD shall notify the United States and the State within 10 days after service or receipt of any Motion for Summary Judgment and within 10 days after receipt of any order from a court setting a case for trial.

77.     **Res Judicata and Other Defenses**. In any subsequent administrative or judicial proceeding initiated by the United States or the State for injunctive relief, recovery of response costs, or other appropriate relief relating to the Site, SD and, with respect to a State action, SFAs shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, res judicata, collateral estoppel, issue preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by the United States or the State in the subsequent proceeding were or should have been brought in the instant case; provided, however, that nothing in this Paragraph affects the enforceability of the covenants not to sue set forth in Section XVI (Covenants by Plaintiffs).

# XIX.   ACCESS TO INFORMATION

78.     SD shall provide to EPA and the State, upon request, copies of all records, reports, documents, and other information (including records, reports, documents, and other information in electronic form) (hereinafter referred to as "Records") within SD's possession or control or that of its contractors or agents relating to activities at the Site or to the implementation of this CD, including, but not limited to, sampling, analysis, chain of custody records, manifests, trucking logs, receipts, reports, sample traffic routing, correspondence, or other documents or information regarding the Work. SD shall also make available to EPA and the State, for purposes of investigation, information gathering, or testimony, their employees, agents, or representatives with knowledge of relevant facts concerning the performance of the Work.

79.     **Privileged and Protected Claims**.

        a.      SD may assert that all or part of a Record requested by Plaintiffs is privileged or protected as provided under federal law, in lieu of providing the Record, provided SD complies with ¶ 79.b, and except as provided in ¶ 79.c.

        b.      If SD asserts a claim of privilege or protection, it shall provide Plaintiffs with the following information regarding such Record: its title; its date; the name, title, affiliation (e.g., company or firm), and address of the author, of each addressee, and of each recipient; a description of the Record's contents; and the privilege or protection asserted. If a claim of privilege or protection applies only to a portion of a Record, SD shall provide the Record to Plaintiffs in redacted form to mask the privileged or protected portion only. SD shall retain all Records that it claims to be privileged or protected until Plaintiffs have had a reasonable opportunity to dispute the privilege or protection claim and any such dispute has been resolved in the SD's favor.

        c.      SD may make no claim of privilege or protection regarding: (1) any data regarding the Site, including, but not limited to, all sampling, analytical, monitoring, hydrogeologic, scientific, chemical, radiological or engineering data, or the portion of any other Record that evidences conditions at or around the Site; or (2) the portion of any Record that SD is required to create or generate pursuant to this CD.

80.     **Business Confidential Claims**. SD may assert that all or part of a Record provided to Plaintiffs under this Section or Section XX (Retention of Records) is business confidential to the extent permitted by and in accordance with Section 104(e)(7) of CERCLA, 42 U.S.C. § 9604(e)(7), and 40 C.F.R. § 2.203(b). SD shall segregate and clearly identify all Records or parts thereof submitted under this CD for which SD asserts business confidentiality claims. Records submitted to EPA determined to be confidential by EPA will be afforded the protection specified in 40 C.F.R. Part 2, Subpart B. If no claim of confidentiality accompanies Records when they are submitted to EPA and the State, or if EPA has notified SD that the Records are not confidential under the standards of Section 104(e)(7) of CERCLA or 40 C.F.R. Part 2, Subpart B, the public may be given access to such Records without further notice to SD.

81.     If relevant to the proceeding, the Parties agree that validated sampling or monitoring data generated in accordance with the SOW and reviewed and approved by EPA shall be admissible as evidence, without objection, in any proceeding under this CD.

82.     Notwithstanding any provision of this CD, Plaintiffs retain all of their information gathering and inspection authorities and rights, including enforcement actions related thereto, under CERCLA, RCRA, and any other applicable statutes or regulations.

## XX.   RETENTION OF RECORDS

83.     Until 10 years after EPA's Certification of Work Completion under ¶ 4.8 (Certification of Work Completion) of the SOW, SD shall preserve and retain all non-identical copies of Records (including Records in electronic form) now in its possession or control or that come into its possession or control that relate in any manner to its liability under CERCLA with respect to the Site, and all Records that relate to the liability of any other person under CERCLA with respect to the Site. SD must also retain, and instruct its contractors and agents to preserve, for the same period of time specified above all non-identical copies of the last draft or final version of any Records (including Records in electronic form) now in its possession or control or that come into its possession or control that relate in any manner to the performance of the Work, provided, however, that SD (and its contractors and agents) must retain, in addition, copies of all data generated during the performance of the Work and not contained in the aforementioned Records required to be retained. Retention of an electronic copy of a Record satisfies the requirement to retain such Record, provided that 1) SD shall retain a hard copy of any Record which any applicable law requires be maintained in hard copy to have legal effect; 2) SD shall retain a hard copy of any oversized document; and 3) SD shall ensure that any electronic copy of any Record is legible and, if originally electronic, is maintained in both its native format and in a format that is reasonably accessible to the public.  Each of the above record retention requirements shall apply regardless of any corporate retention policy to the contrary.

84.     The United States acknowledges that each SFA is subject to all applicable federal record retention laws, regulations, and policies.

85.     At the conclusion of this record retention period, SD shall notify the United States and the State at least 90 days prior to the destruction of any such Records, and, upon request by

the United States or the State, and except as provided in ¶ 79 (Privileged and Protected Claims), SDs shall deliver any such Records to EPA or the State.

86.     SD certifies that, to the best of its knowledge and belief, after thorough inquiry, it has not altered, mutilated, discarded, destroyed, or otherwise disposed of any Records (other than identical copies) relating to its potential liability regarding the Site since notification of potential liability by the United States or the State and that it has fully complied with any and all EPA and State requests for information regarding the Site pursuant to Sections 104(e) and 122(e)(3)(B) of CERCLA, 42 U.S.C. §§ 9604(e) and 9622(e)(3)(B), and Section 3007 of RCRA, 42 U.S.C. § 6927, and state law.

## XXI.  OTHER OUTSTANDING ORDERS

87.     Upon the Effective Date of this Consent Decree and, with respect to the Related Orders listed in SOW Section 8 (Related Orders) upon completion of the respective provisions of SOW Section 8, and except as provided in ¶ 88, below, SD's obligations under the Related Orders are deemed satisfied and all actions have been fully performed in accordance with the terms of the Related Orders. This Paragraph shall serve as EPA's written Notice of Completion to Settling Defendant, in accordance with the terms of the Related Orders, for each of the Related Orders.

88.     The following requirements of the Related Orders remain in effect and are incorporated into this CD as enforceable requirements:

         a.     Record Retention.  Until 10 years after Effective Date, SD shall preserve and retain all non-identical copies of records and documents (including records or documents in electronic form) now in its possession or control or which come into its possession or control that relate to the performance of the Work (as defined in each Related Order) or the liability of any person under CERCLA with respect to the St. Francois County Mining Area, regardless of any corporate retention policy to the contrary.  SD shall also instruct its contractors and agents to preserve and retain all non-identical copies of documents, records, and information of whatever kind, nature or description relating to performance of the Work (as defined in each Related Order).  At the conclusion of this document retention period, SD shall notify EPA at least 90 days prior to the destruction of any such records or documents, and, upon request by EPA, SD shall deliver any such records or documents to EPA.  SD may assert that certain documents, records and other information are privileged under the attorney-client privilege or any other privilege recognized by federal law.  If SD asserts such a privilege, it shall provide EPA with the following: 1) the title of the document, record, or information; 2) the date of the document, record, or information; 3) the name and title of the author of the document, record, or information; 4) the name and title of each addressee and recipient; 5) a description of the subject of the document, record, or information; and 6) the privilege asserted by SD.  However, no documents, reports or other information created or generated pursuant to the requirements of the Related Orders shall be withheld on the grounds that they are privileged.

         b.     Access.  If any property within the St. Francois County Mining Area where access is needed to implement one of the Related Orders is owned or controlled by SD, SD shall, commencing on the Effective Date, provide EPA and its representatives, including

contractors, with access at all reasonable times to the property for the purpose of conducting any activity related to the relevant Related Order.

        c.      Post-Removal Site Control.  With respect to AOC CERCLA Docket No. 07-2000-024 (Bonne Terre Western Portion), AOC CERCLA Docket No. 07-2000-025 (Bonne Terre Eastern Portion), AOC Docket No. VII-94-F-0015 (Desloge / Big River), UAO Docket No. CERCLA 07-2005-0169 (Elvins UAO), UAO Docket No. CERCLA 07-2006-0272 (Leadwood UAO), and UAO Docket No. CERCLA 07-2006-0231 (National UAO), SD shall provide long-term operation and maintenance of such sites to ensure the long-term effectiveness and integrity of the removal action as constructed by SD and as described in the applicable EPA-approved Removal Action Report.  SD shall implement the Post-Removal Site Control Plan including appropriate land-use restrictions as approved by EPA.

       89.      EPA will use its best efforts to determine whether to approve or deny a request for a Notice of Completion of the Work pursuant to Paragraph 76 of the 2016 UAO within one year after SD submits a Final Report requesting a Notice of Completion of the Work pursuant to Paragraph 76.a of the 2016 UAO.  Such decision will not be unreasonably delayed.

## XXII. NOTICES AND SUBMISSIONS

      90.      All approvals, consents, deliverables, modifications, notices, notifications, objections, proposals, reports, and requests specified in this CD must be in writing unless otherwise specified. Whenever, under this CD, notice is required to be given, or a report or other document is required to be sent, by one Party to another, it must be directed to the person(s) specified below at the addresses specified below. Any Party may change the person and/or address applicable to it by providing notice of such change to all Parties. All notices under this Section are effective upon receipt, unless otherwise specified. Notices required to be sent to EPA, and not to the United States, should not be sent to the DOJ. Except as otherwise provided,

notice to a Party by email (if that option is provided below) or by regular mail in accordance with this Section satisfies any notice requirement of the CD regarding such Party.

**As to the United States**:         EES Case Management Unit
U.S. Department of Justice
Environment and Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044-7611
eescdcopy.enrd@usdoj.gov
Re: DJ # 90-11-3-09306/4

and:

Chief
U.S. Department of Justice
Environment and Natural Resources Division
Environmental Defense Section
P.O. Box 7611
Washington, D.C. 20044-7611
Re: DJ # 90-11-6-19877

**As to EPA**:         Chief
Superfund Branch
Office of Regional Counsel
United States Environmental Protection Agency
Region 7
11201 Renner Boulevard
Lenexa, Kansas 66219

**and**:         Chief
Lead Mining and Special Emphasis Branch
Superfund Division
United States Environmental Protection Agency
Region 7
11201 Renner Boulevard
Lenexa, Kansas 66219

| | |
|---|---|
| **As to the Regional Financial Management Officer**: | Financial Management Services Team<br>United States Environmental Protection Agency<br>Region 7<br>11201 Renner Boulevard<br>Lenexa, Kansas 66219 |
| **At to EPA Cincinnati Finance Center**: | EPA Cincinnati Finance Center<br>26 W. Martin Luther King Drive<br>Cincinnati, Ohio 45268<br>cinwd_acctsreceivable@epa.gov |
| **As to the State**: | Brandon Wiles<br>State Project Manager<br>Missouri Department of Natural Resources<br>Hazardous Waste Program<br>P.O. Box 176<br>Jefferson City, MO 65102-0176<br>Brandon.Wiles@dnr.mo.gov |
| **As to SD**: | Chris Neaville<br>SDs' Project Coordinator<br>Asset Development Director<br>The Doe Run Company<br>Suite 300<br>1801 Park 270 Drive<br>St. Louis, MO  63146<br>314-453-7132 |

## XXIII.      RETENTION OF JURISDICTION

91.     This Court retains jurisdiction over both the subject matter of this CD and SD for the duration of the performance of the terms and provisions of this CD for the purpose of enabling any of the Parties to apply to the Court at any time for such further order, direction, and relief as may be necessary or appropriate for the construction or modification of this CD, or to effectuate or enforce compliance with its terms, or to resolve disputes in accordance with Section XIV (Dispute Resolution).

## XXIV.      APPENDICES

92.     The following appendices are attached to and incorporated into this CD:

"Appendix A" is the ROD.

"Appendix B" is the SOW.

"Appendix C" is the description and/or map of the Site.

"Appendix D" is the schedule for financial assurance.

"Appendix E" is the Preauthorization Decision Document.

"Appendix F" is a map of the Response Area.

"Appendix G" is the Form of Financial Assurance Trust Agreement

"Appendix H" is the Requirements for Removal Action, Hayden Creek Mining Area

"Appendix I" is the List of Native Plant Species for Leadwood Revegetation

## XXV. MODIFICATION

93.     Except as provided in ¶ 13 (Modification of SOW or Related Deliverables),
material modifications to this CD, including the SOW, shall be in writing, signed by the United
States and SD, and shall be effective upon approval by the Court. Except as provided in ¶ 13,
non-material modifications to this CD, including the SOW, shall be in writing and shall be
effective when signed by duly authorized representatives of the United States and SD. All
modifications to the CD, other than the SOW, also shall be signed by the State, or a duly
authorized representative of the State, as appropriate. A modification to the SOW shall be
considered material if it implements a ROD amendment that fundamentally alters the basic
features of the selected remedy within the meaning of 40 C.F.R. § 300.435(c)(2)(ii). Before
providing its approval to any modification to the SOW, the United States will provide the State
with a reasonable opportunity to review and comment on the proposed modification.

## XXVI.     LODGING AND OPPORTUNITY FOR PUBLIC COMMENT

94.     This CD shall be lodged with the Court for at least 30 days for public notice and
comment in accordance with Section 122(d)(2) of CERCLA, 42 U.S.C. § 9622(d)(2), and
28 C.F.R. § 50.7. The United States reserves the right to withdraw or withhold its consent if the
comments regarding the CD disclose facts or considerations that indicate that the CD is
inappropriate, improper, or inadequate. SD consents to the entry of this CD without further
notice.

95.     If for any reason the Court should decline to approve this CD in the form
presented, this agreement is voidable at the sole discretion of any Party and the terms of the
agreement may not be used as evidence in any litigation between the Parties.

## XXVII.     SIGNATORIES/SERVICE

96.     The undersigned representative of SD to this CD and the Assistant Attorney
General for the Environment and Natural Resources Division of the Department of Justice and
the Director of the Missouri Department of Natural Resources for the State certifies that he or

she is fully authorized to enter into the terms and conditions of this CD and to execute and legally bind such Party to this document.

      97.    SD agrees not to oppose entry of this CD by this Court or to challenge any provision of this CD unless the United States has notified SD in writing that it no longer supports entry of the CD.

      98.    SD shall identify, on the attached signature page, the name, address, and telephone number of an agent who is authorized to accept service of process by mail on behalf of that Party with respect to all matters arising under or relating to this CD. SD agrees to accept service in that manner and to waive the formal service requirements set forth in Rule 4 of the Federal Rules of Civil Procedure and any applicable local rules of this Court, including, but not limited to, service of a summons. SD need not file an answer to the complaint in this action unless or until the Court expressly declines to enter this CD.

## XXVIII.       FINAL JUDGMENT

      99.    This CD and its appendices constitute the final, complete, and exclusive agreement and understanding among the Parties regarding the settlement embodied in the CD. The Parties acknowledge that there are no representations, agreements, or understandings relating to the settlement other than those expressly contained in this CD.

      100.    Upon entry of this CD by the Court, this CD shall constitute a final judgment between and among the United States, the State, and SD. The Court enters this judgment as a final judgment under Fed. R. Civ. P. 54 and 58.

SO ORDERED THIS __ DAY OF _____, 20__.


                                 _____
                                   United States District Judge

Signature Page for CD regarding OU-1 of the Big River Mine Tailings Superfund Site

**FOR THE UNITED STATES OF AMERICA:**

3/21/18
Dated

JEFFREY H. WOOD
Acting Assistant Attorney General
U.S. Department of Justice
Environment and Natural Resources Division
Washington, D.C. 20530

Eric D. Albert
Trial Attorney
U.S. Department of Justice
Environment and Natural Resources Division
Environmental Enforcement Section
P.O. Box 7611
Washington, D.C. 20044-7611

Phillip Dupré
U.S. Department of Justice
Environment and Natural Resources Division
Environmental Defense Section
P.O. Box 7611
Washington, D.C. 20044-7611

Signature Page for CD regarding OU-1 of the Big River Mine Tailings Superfund Site

James B. Gulliford
Regional Administrator
U.S. Environmental Protection Agency
Region 7
11201 Renner Boulevard
Lenexa, Kansas 66219

Steven L. Sanders
Senior Counsel
U.S. Environmental Protection Agency
Region 7
11201 Renner Boulevard
Lenexa, Kansas 66219

Signature Page for CD regarding OU-1 of the Big River Mine Tailings Superfund Site

**FOR THE STATE OF MISSOURI:**

_____
Dated

Shawna Bligh
Assistant Attorney General
Agriculture and Environment Division
P.O. Box 899
Jefferson City, MO  65102

1-30-2018
Dated

Carol S. Comer, Director
Missouri Department of Natural Resources
P.O. Box 176
Jefferson City, MO 65102-0176

45

Signature Page for CD regarding OU-1 of the Big River Mine Tailings Superfund Site

**FOR THE DOE RUN RESOURCES CORPORATION:**

January 31, 2018
Dated

Matthew D. Wohl
Vice President - Law
1801 Park 270 Drive, Ste. 300
St. Louis, MO 63146

Agent Authorized to Accept Service    Name (print):
on Behalf of Above-signed Party:      Title:
                                      Company:   CT Corporation System
                                      Address:   120 South Central Avenue, Ste. 400
                                                 Clayton, MO 63105
                                      Phone:     314.863.5545
                                      email:

46